# Court of Appeals, State of Michigan

## ORDER

In re R Smith Minor

Docket No. 339478

LC No. 2015-015117-NA

William B. Murphy
Presiding Judge

Kathleen Jansen

Brock A. Swartzle
Judges

---

The Court orders that the April 19, 2018 opinion is hereby VACATED, and a new opinion is forthcoming.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

APR 2 0 2018

Date

Chief Clerk

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* R. SMITH, Minor.

FOR PUBLICATION
April 19, 2018
9:00 a.m.

No. 339478
Livingston Circuit Court
Family Division
LC No. 2015-015117-NA

Before: MURPHY, P.J., and JANSEN and SWARTZLE, JJ.

SWARTZLE, J.

Respondent Lynnie Feipel's minor son, RS, faced significant medical problems, including cerebral palsy and fetal-hydantoin syndrome. At the age of nine years old, RS weighed approximately 35 lbs. and could not talk other than to say "momma." After a seven-day hearing, the trial court terminated respondent's parental rights to RS and this appeal followed. Several weeks prior to oral argument, RS passed away. This Court cannot, therefore, reunite respondent and RS regardless of the merits of her appeal. Yet, concluding that the appeal is not moot because respondent faces collateral legal consequences as a result of the termination, we reach the merits and hold that the trial court did not err in terminating respondent's parental rights.

## I. BACKGROUND

Respondent had two biological children: an older daughter who was placed in a guardianship with respondent's mother in 2006, and a younger son who remained in respondent's care until petitioner intervened in 2015. The younger son, RS, was born in 2006 and was the only child subject to this appeal. [1]

RS had extensive medical problems, which essentially form the basis for both his initial placement in foster care and the decision to terminate respondent's parental rights. Respondent testified that RS suffered from cerebral palsy. RS started having myoclonic-epilepsy seizures when he was a year old; they occurred approximately every other month and were triggered when he was woken suddenly or heard loud noises. He also had asthma and was prone to severe

---

[1] The parental rights of the child's father were also terminated. He is not a party to this appeal.

vomiting, which required the use of various feeding tubes. RS weighed only 35 lbs. at nine years old.

RS also suffered from fetal-hydantoin syndrome, which caused muscle spasms, and he had a small cerebellum and cranium. RS was unable to walk or sit up on his own and could not talk other than saying "momma." He wore a vest for chest congestion and used a suction machine. RS required a specialized wheelchair for movement and a special feeding chair to be fed upright. Even with special foot braces and a stander, RS could only stand upright for a short period three times a day. When he was not at school, he spent the majority of his time in bed.

Respondent and RS had a lengthy history with Child Protective Services (CPS). In October 2015, petitioner moved the trial court to take jurisdiction over RS and remove him from respondent's home. The petition alleged that respondent was unable to provide adequate medical care for RS, that respondent and RS had missed 40 doctor appointments in the previous 10 months, and that respondent refused to allow service providers to come to her home. The petition also alleged that, during a home visit in October 2015, the caseworker saw RS's grandmother smoking in the home next to an oxygen breathing machine. Eleven people were living in the three-bedroom home, and the caseworker did not observe any medical supplies or medical bed for RS. The petition further alleged that respondent was suspected of having deliberately removed a stomach tube from RS's stomach, allegedly to prevent RS's discharge from the hospital during one of his stays there. The petition also contained allegations about respondent's mental health, lack of employment, and inability to stop other family members from smoking in the home.

The trial court authorized the petition on October 21, 2015, at which time it made RS a ward of the court and placed him in petitioner's care. In December 2015, respondent entered a plea of admission to several allegations contained in the petition. She acknowledged most of the above allegations and admitted that RS did not have his own room, his medical bed and other equipment were stored in the garage, and others in the home smoked. She also admitted that she had anxiety, depression, and a bipolar disorder. Respondent testified that she was married to and living with William Barnes, despite his extensive criminal history, which included a conviction for domestic violence. She acknowledged that her prior history with CPS included numerous allegations of domestic violence between herself and Barnes and that petitioner had offered services to her and RS in the past.

A parent-agency treatment plan was put in place in January 2016. The treatment plan required respondent and Barnes to obtain a psychological evaluation, continue mental-health counseling, obtain employment and housing, properly care for RS's medical needs, attend all of his medical appointments, follow the medical recommendations, participate in a substance-abuse assessment and random drug screens, contact the agency for transportation help if needed, and complete a domestic-violence assessment.

Review hearings were held regularly. At a review hearing in April 2016, respondent's caseworker, Ann Kotch, stated that respondent had reported that she had been fired from her part-time job and had been removed from the waiting list for subsidized housing. The trial court noted that it had reviewed reports submitted for respondent and Barnes, and that respondent and Barnes had made inconsistent statements to various service providers. At a review hearing in

July 2016, another caseworker, Jessica Girz, and the prosecutor reported that all of the barriers to reunification remained the same—Barnes had not been drug testing, respondent was unemployed, and respondent was harassing caseworkers and threatening to sue them. Respondent's counsel further acknowledged that respondent had not attended all of RS's medical appointments.

Finally, at a review hearing in October 2016, Kotch advised the trial court that respondent's therapist had reported that respondent refused to address her role in RS's removal. Respondent had attended six therapy sessions and requested a new therapist, but had not provided information about a replacement or releases for information. The guardian ad litem reported that respondent had only attended 17 of 54 doctor appointments. Accordingly, petitioner requested that the goal be changed to termination. The trial court authorized the petition due to respondent's non-compliance with her treatment plan.

Petitioner filed a supplemental petition in November 2016 requesting termination of respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j). Also around this time, respondent's parenting time was suspended after she filed a baseless CPS complaint against RS's foster parents and was involved in an altercation with Kotch at one of RS's hospital appointments.

A seven-day termination hearing was held between February and May 2017. Regarding her relationship with Barnes, respondent testified that she was aware that Barnes had a criminal history, including a conviction for domestic violence, and that this history prevented Barnes from visiting RS. Still, respondent denied that Barnes was ever violent toward her. Respondent acknowledged Barnes's history of substance abuse and mental-health issues and stated that, although Barnes participated in random drug testing, he had not provided those records to petitioner.

With respect to respondent's own mental-health concerns, she testified that she had been attending therapy and that she no longer needed to take anxiety medication. One of the recommendations after her psychological evaluation was that she see a psychiatrist, but she had not seen one for more than two years. She was taking medications prescribed by her primary-care doctor and had not provided therapy records to her caseworker.

Respondent acknowledged having had a substance-abuse problem in the past, but testified that the problem was behind her. Respondent testified that she had not completed all of the required drug screens and had stopped testing after November 2016. According to respondent, she stopped testing because she was not provided with transportation assistance, though she acknowledged she did not request this assistance. She later stated that transportation was not really a barrier for her to attend her services because a bus stop was only a quarter of a mile from her home. Respondent acknowledged that her caseworker had arranged for a service to come to her home for testing, but stated that she did not allow them to come into her home because it was an invasion of her privacy.

Regarding RS's medical appointments, respondent claimed that she attended all of the appointments of which she had been informed. Still, respondent acknowledged that she missed some other appointments for various reasons, including transportation problems, her own

conflicting appointments, and her belief that the appointments had been cancelled or that she was not allowed to attend. Later, however, respondent denied that she had missed any appointments due to transportation problems.

Respondent denied that she pulled out RS's stomach tube and claimed that she received information that a nurse had confessed to pulling out the tube, although no such information was offered for the record. Respondent testified at length about the mechanisms for feeding RS through his stomach tube, but she complained that no one had given her instructions for any special cleaning or care needed in connection with the use of the tube.

Respondent acknowledged that employment was an issue she needed to address and claimed that she was looking for work and trying to obtain her GED. Still, respondent admitted that she did not tell her caseworker about her job search. Respondent later testified that she had not looked for work, explaining that she had been busy with court. Respondent was not concerned about money because Barnes worked and she received public assistance.

With respect to her current housing, respondent testified that she obtained an apartment in Ypsilanti in September 2016 and had obtained rent assistance. Respondent testified that her caseworker came to the apartment and determined that it was not suitable for RS because it did not have handicap-accessible ramps, but later maintained that her caseworker never told her that the apartment was unsuitable. Respondent stated that Barnes's name was on the lease, but he was hardly there due to his work. Respondent admitted that both she and Barnes smoked, but denied that they smoked in the home and said that she and Barnes washed their hands and changed their clothes after smoking.

RS's foster mother, Natalie Burge, testified at length about the amount of daily care and medical equipment RS required. Burge stated that RS's cognitive development was between a toddler and an adolescent. Doctors had told her that RS's cognition and other chronic medical conditions were not likely to improve. Burge explained that RS currently had two tubes for feeding and drainage and described the considerable daily tasks involved in taking care of the tubes. Burge discussed an esophageal-disconnect surgery that RS underwent in June 2016 to relieve his vomiting and its success, which led to a significant weight gain. According to Burge, respondent was informed earlier that the surgery would help RS, but respondent, although agreeing that the surgery would be helpful, told Burge that it "was going to be in the way future" and not to worry about it. Burge acknowledged that "a handful" of RS's doctor appointments were scheduled too quickly to provide much notice to respondent, but maintained that she provided notice to Kotch of all of the scheduled appointments.

Kotch testified that respondent had missed 30 of RS's 62 scheduled doctor appointments, surgeries, or other procedures, despite being informed of all of them. Kotch maintained that, in the past, respondent would not agree with the doctors' recommendations, particularly with regard to discharging RS, and would become hostile to them.

As to the other aspects of the treatment plan, Kotch further testified that respondent had not addressed her need to provide housing for RS because respondent's current home did not have a wheelchair ramp and that respondent had told Kotch that she was not interested in becoming employed. Kotch further stated that respondent was not compliant with drug

screening and that she had received a number of hostile or inappropriate text messages from respondent, which led Kotch to require that respondent communicate with her only by phone or in person. According to Kotch, respondent was inconsistent in her psychiatric treatment, had refused to address the reasons RS was put in foster care, and refused to release therapy information to the caseworker.

With respect to respondent's relationship with Barnes, Kotch testified that it remained a barrier to reunification. Kotch testified that respondent had not dealt with the issues posed by Barnes's criminal history and that Barnes had stopped drug testing almost a year earlier. Kotch testified that Barnes participated in the psychological and substance-abuse assessments, but he did not follow the recommendations.

Regarding her efforts to help respondent with reunification, Kotch stated that respondent informed her that she had applied for housing from the Michigan State Housing Development Authority and stated that respondent did not ask Kotch for other assistance with housing. Kotch scheduled monthly meetings with respondent and consistently asked if respondent needed assistance with any of her services, including obtaining housing. She provided respondent with bus tokens, gas cards, and she and others had personally transported respondent to services and parenting times. RS's insurance also covered transportation to medical appointments.

After the close of proofs, the trial court concluded that petitioner had established grounds for termination of respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (g) and (j). Regarding MCL 712A.19b(c)(*i*), the trial court concluded that respondent had failed to rectify the conditions that led to RS's removal. The trial court concluded that respondent had not made sufficient progress in addressing her own mental health to be able to take care of RS's extensive medical needs. The trial court noted that respondent had inconsistently attended therapy and that she refused to address her role in RS's removal. With respect to respondent's employment, the trial court concluded that respondent had no interest in working so that she could be able to meet RS's needs, meaning that her employment issues were not likely to be rectified in the near future. The trial court also concluded that respondent remained without adequate housing to address RS's needs because her current apartment did not have a handicap-accessible ramp and that respondent's own conduct prevented petitioner from assisting respondent in finding suitable housing. The trial court determined that one of the main issues that led to RS's removal was respondent's inability to care for him medically. The trial court concluded that respondent was in no better position to care for RS than at the time he was removed. The trial noted that respondent failed to attend many of RS's appointments and was confrontational with his medical providers. With respect to respondent's claim that she was not provided adequate instruction on how to care for RS, the trial court determined that respondent's claim was not credible and found that any instructional issue was due to respondent's combativeness or inability to understand the instructions.

With regard to MCL 712A.19b(3)(g), the trial court concluded that respondent had failed to provide proper care and custody for RS and that there was no reasonable expectation that she would be able to do so within a reasonable time. The trial court found that respondent failed to provide proper care because respondent failed to comply with the treatment plan. Respondent's failure to comply with the treatment plan also served as the basis for the trial court's conclusion under MCL 712A.19b(3)(j) that RS was reasonably likely to be harmed if returned to

-5-

respondent's home. The trial court found that respondent was in no better position to address RS's medical needs given her combativeness with medical personnel and her inconsistent attendance at RS's appointments and that respondent's current home was unsafe for RS to live in. The trial court found that these issues were not likely to be rectified within a reasonable time considering RS's age.

The trial court found that petitioner had met its burden to provide reasonable efforts to reunify the family and rectify the identified problems, but that respondent had not availed herself of that assistance. Because of respondent's refusal to address the deficiencies outlined in her treatment plan and RS's vulnerable state, the trial court concluded that termination of respondent's parental rights was justified considering RS's best interests. MCL 712A.19b(5).

This appeal followed. During the pendency of this appeal, RS died of complications from his cerebral palsy.

## II. ANALYSIS

## A. MOOTNESS

As an initial matter, because the minor child has died, we must first determine whether the termination of respondent's parental rights presents a justiciable issue over which the parties may invoke this Court's jurisdiction.

The courts of this state may only exercise the authority granted to them by Article VI of the 1963 Constitution. An essential element of that authority is that courts will not reach moot issues. *In re Detmer/Beaudry*, 321 Mich App 49, 55; ___ NW2d ___ (2017). Therefore, to warrant our review, the parties must present this Court with a real controversy, rather than a hypothetical one. *Id*. at 55-56. This requirement, commonly known as the real-case-or-controversy requirement, prevents this Court from rendering advisory opinions "that have no practical legal effect in a case." *Id*. at 55 (internal citation and quotation marks omitted). "Thus, before we can reach the merits of this appeal, we must first consider whether it has become moot" by the child's death. *Id*. at 56.

"Generally speaking, a case becomes moot when an event occurs that makes it impossible for a reviewing court to grant relief," i.e., when the case presents only "abstract questions of law which do not rest upon existing facts or rights." *Id*. (internal citation and quotation marks omitted). A case is not moot, however, where "a court's adverse judgment may have collateral legal consequences" for at least one of the parties. *Id*. (internal citation and quotation marks omitted). "When no such collateral legal consequences exist, and there is no possible relief that a court could provide, the case is moot and should ordinarily be dismissed without reaching the underlying merits." *Id*.

Both parties argue that the minor child's death does not render this case moot despite the inability of respondent to assume care of the child in the event that this Court reverses the trial court's termination. While we are not bound by the parties' agreement on this legal issue, see *In re Jarrell*, 172 Mich App 122, 123-124; 431 NW2d 426 (1988), we agree that this case is not

moot because the trial court's termination of respondent's parental rights may have collateral legal consequences for respondent.

In the immediate context of termination proceedings, the trial court's termination of respondent's parental rights may provide a statutory ground to terminate respondent's parental rights to another child. MCL 712A.19b(3)(i).[2] Moreover, as respondent points out, a prior termination is a relevant matter for the trial court to consider when determining whether petitioner should be required to provide reunification services in the event that another child is removed from respondent's care. MCL 712A.19b(3)(c).[3] Additionally, the termination may affect respondent's ability to direct the child's property post-mortem or wrap up legal or medical affairs concerning the child. See *In Interest of ECG*, 345 NW2d 138, 141 (Iowa, 1984). Finally, given the facts of this case, the termination may affect respondent's ability to obtain future employment, especially in the medical or child-care sectors.

Therefore, we conclude that the case is not moot because collateral legal consequences still exist, even given the unfortunate passing of RS. See *In re Detmer/Beaudry*, 321 Mich App at 56; see also *In re Welfare of Child of JKT*, 814 NW2d 76, 84-85 (Minn Ct App, 2012) (applying the collateral-legal-consequences rule when the minor child died during the pendency of the appeal); *In Interest of ECG*, 345 NW2d at 141 (same).

## B. REASONABLE EFFORTS

Moving to the merits, respondent argues that the trial court erred in finding that petitioner made reasonable efforts to reunify her with the minor child. Absent exceptions not present here, petitioner is required to make reasonable efforts to reunify families and to rectify the conditions that led to the initial removal. See *In re Terry*, 240 Mich App 14, 25-26; 610 NW2d 563 (2000). We review the trial court's findings regarding reasonable efforts for clear error. *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005). "A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made." *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011).

---

[2] MCL 712A.19b(3)(i) has been amended, effective June 12, 2018. See 2018 PA 58. Under the current version of the statute, a prior termination involving serious neglect is a statutory ground to terminate rights to a sibling when "prior attempts to rehabilitate the parents have been unsuccessful." MCL 712A.19b(3)(i). Under the new version of the statute, a prior termination involving serious neglect is a statutory ground to terminate rights to a sibling only when "the parent has failed to rectify the conditions that led to the prior termination of parental rights." MCL 712A.19b(3)(i) as amended by 2018 PA 58.

[3] As currently codified, MCL 712A.19a(2)(c) permits the trial court to order that reunification services not be made if the parent has had her rights to another child involuntarily terminated. As amended by 2018 PA 58, the trial court may only order that reunification services not be made under MCL 712A.19a(2)(c) if "the parent has failed to rectify the conditions that led to that termination of parental rights."

Respondent challenges the adequacy of petitioner's efforts with regard to transportation, job services, housing, and ongoing medical training. After reviewing the record, we are satisfied that petitioner's reunification efforts were reasonable.

With respect to housing, respondent was able to obtain housing with rent assistance. Respondent acknowledged that the caseworker visited her apartment and determined that it was not suitable because it did not have handicap-accessible ramps. The caseworker offered to help respondent find suitable housing, but respondent refused. Similarly, the caseworker offered to help respondent obtain employment but respondent did not fully avail herself of those services. We agree with the trial court that respondent never intended to work. Respondent provided myriad reasons for why she did not seek employment, and stated that her husband could provide financially for her and the minor child.

Regarding transportation, respondent acknowledged that she was provided with assistance, including gas cards and rides. The caseworker also testified that respondent was provided with transportation assistance. Indeed, respondent acknowledged that she had not asked petitioner for further assistance with transportation, and that, in any event, she could use a bus stop near her home. Accordingly, the record makes clear that petitioner provided the necessary transportation assistance respondent requested.

Respondent claims that she did not receive the proper medical training to provide for RS. Although respondent claimed that no one explained any special cleaning or care needed in connection with the use of the child's stomach tube, she testified at length about the mechanisms for feeding the child through the tube. Moreover, respondent missed 30 of RS's 62 medical appointments despite being informed of them and, during the appointments she did attend, respondent frequently argued with care providers. Accordingly, the record makes clear that, if respondent did not receive some training, her own conduct was the cause.

Respondent also asserts that petitioner's duty required it to tailor its reunification assistance to the child's specific needs, in particular his numerous severe medical conditions. Respondent argues that she was entitled to more intensive services and that petitioner's "cookie cutter" approach to the case was insufficient to satisfy its duty to provided reasonable reunification efforts. In support of this argument, respondent cites only caselaw establishing a duty by petitioner to tailor services to accommodate a disabled parent under the Americans with Disabilities Act, 42 USC 12101 *et seq.*, rather than a disabled child. Respondent does not identify a disability of her own that required accommodation and a "party may not leave it to this Court to search for authority to sustain or reject its position." *People v Fowler*, 193 Mich App 358, 361; 483 NW2d 626 (1992).

In any event, a significant component of respondent's treatment plan required her to attend RS's medical appointments so that she could be aware of his needs and learn how to provide the specialized care he required. Respondent failed to attend approximately half of the child's appointments and frequently argued with care providers when she did attend appointments. Moreover, as discussed previously, respondent failed to avail herself of many of the services that were offered.

Therefore, the record makes clear that, although petitioner met its obligation to provide reasonable reunification services to respondent, respondent did not uphold her commensurate responsibility to engage in and benefit from those services. *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). Accordingly, respondent's claim that petitioner failed to provide reunification services is without merit.

## C. STATUTORY GROUNDS

Respondent next argues that the trial court erred when it found that petitioner had established the statutory grounds for termination by clear and convincing evidence. "In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). We review for clear error a trial court's ruling that a statutory ground for termination has been proved by clear and convincing evidence. *In re Hudson*, 294 Mich App at 264.

The trial court found that grounds for terminating respondent's parental rights were established under MCL 712A.19b(3)(c)(*i*), (g), and (j), which authorize termination of parental rights under the following circumstances:

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

### 1. MCL 712A.19B(3)(c)(*i*)

The trial court did not clearly err in finding that termination of respondent's parental rights was justified under MCL 712A.19b(3)(c)(*i*). The initial requirements were that respondent obtain a psychological evaluation and follow the recommendations, continue mental-health counseling, seek employment and housing, properly care for the child's medical needs,

participate in a substance-abuse assessment and random drug screens, contact the agency for transportation help if needed, and complete a domestic-violence assessment and comply with the recommendations. The trial court found that respondent made minimal progress in meeting these requirements.

Regarding respondent's employment, we agree with the trial court that respondent did not intend to work. As noted previously, respondent provided a number of excuses as to why she could not work and did not provide petitioner with any documentation of her job search. Considering respondent's belief that she did not need to work, we agree that this issue was unlikely to be resolved within a reasonable time.

With respect to respondent's housing, although respondent had obtained an apartment during the time RS was placed with petitioner, the apartment did not have a handicap-accessible ramp. Although petitioner offered to help respondent find suitable housing, respondent refused help. Accordingly, the record indicates that respondent did not meet her suitable housing goals and was unlikely to do so within any reasonable time.

The trial court's finding that respondent had not made sufficient progress in addressing her mental-health concerns is also supported by the record. Respondent met with a number of therapists over the course of the case, but failed to provide the caseworker with a release for her most current mental health provider so that petitioner could track her progress. More importantly, there is no indication that respondent benefitted from any of these services. Respondent refused to address the issues that caused RS's removal and continued to act with hostility toward the child's medical providers and foster parents. Indeed, this hostility eventually resulted in an altercation at the hospital and the suspension of respondent's parenting time. Accordingly, respondent failed to address the main barriers that her mental health posed to the child's care. Given that respondent refused to address these issues throughout the case, as opposed to making a good-faith effort at improving, respondent was not likely to rectify her mental-health issues within any reasonable timeframe.

Finally, with respect to the principal issue that led to the child's removal, clear and convincing evidence showed that respondent made no progress toward demonstrating her ability to care for the child's extensive medical needs. Respondent missed 30 of the child's 62 scheduled doctor appointments, surgeries, or other procedures and respondent continued to be confrontational with medical personnel and their treatment recommendations. Moreover, respondent herself claimed to have inadequate training regarding the minor child's feeding tube. Accordingly, respondent was ill-equipped to address the child's medical needs and, given her inability to participate in the child's care, was unlikely to improve her care-taking abilities in the future.

Despite being provided ample services, respondent made minimal progress in rectifying the conditions that led to the child's adjudication. The trial court did not clearly err in finding that the evidence supported termination of her parental rights under § 19b(3)(c)(*i*).

## 2. MCL 712A.19B(3)(g),(j)

Finally, the record also supports the trial court's reliance on MCL 712A.19b(3)(g) and (j). "A parent's failure to participate in and benefit from a service plan is evidence that the parent will not be able to provide a child proper care and custody." *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014). "Similarly, a parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home." *Id*. at 711. Respondent failed to comply with many of the terms of her treatment plan and made only minimal progress on the other terms. The testimony showed that the child had extensive medical needs and required constant care. Considering respondent's lack of participation in the child's medical care during the time he was in petitioner's care, and her minimal progress in addressing the other requirements of her treatment plan, there was no reasonable expectation that she would be able to care for him within a reasonable time. Given the child's fragile medical condition, there existed a reasonable likelihood that the child would have sufferd serious physical harm if returned to respondent's home.

## III. CONCLUSION

The trial court terminated respondent's parental rights to RS, and during the pendency of the appeal, RS tragically died. While reunification is no longer possible, we conclude that the matter is not moot because respondent faces collateral legal consequences as a result of the termination. Upon review of the merits, we conclude that the trial court did not err in holding that petitioner made reasonable efforts to reunify the family, nor did the trial court err in holding that statutory grounds existed for termination. Respondent does not challenge the trial court's best-interests determination. Accordingly, we affirm termination of respondent's parental rights to RS.

/s/ Brock A. Swartzle
/s/ William B. Murphy
/s/ Kathleen Jansen

-11-