*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re K. PALOMO, Minor.

UNPUBLISHED
December 29, 2020

No. 353196
Kent Circuit Court
Family Division
LC No. 18-052324-NA

Before: RONAYNE KRAUSE, P.J., and MARKEY and BORRELLO, JJ.

PER CURIAM.

Respondent-father, Jose Palomo, appeals by right the trial court's order terminating his parental rights to the minor child, KP, pursuant to MCL 712A.19b(C)(i) (182 days have elapsed since initial dispositional order, conditions continue to exist, and no reasonable likelihood conditions will be timely rectified); MCL 712A.19b(3)(g) (although financially able to do so, parent fails to provide proper care or custody and no reasonable expectation they will timely be able to do so); and MCL 712A.19b(3)(j) (reasonable likelihood of harm if child returned to parent's home). At the time KP was removed from the care of respondent-father and the child's mother, TD, TD was still married to BD, who was therefore legally KP's father. Nevertheless, it was never doubted that TD and BD had not seen each other for several years, respondent-father was treated as if he was KP's father throughout the case, and respondent-father was eventually adjudicated as KP's legal father. Respondent-father (and TD) were addicted to methamphetamines, and they consistently refused to engage in, benefit from, or even recognize the value of the many services offered to them. We affirm.

## I. BACKGROUND

TD and BD had married in 2009, a fact of which respondent-father was unaware and had no reason to be aware at the time of KP's conception in 2017 or birth in July 2018. The proceedings in this matter commenced in September 2018, when all three of TD's children, including KP and two children not at issue,[1] were taken into custody. TD and respondent-father were living together at the time. The petition and the order taking KP into custody both specifically indicated that BD

---

[1] The other two children were children of TD and BD.

was KP's legal father and respondent-father was KP's biological father. According to the petition, TD had an extensive history of substance abuse, including the use of methamphetamine and cocaine; respondent-father had a criminal history and seemingly abused more drugs than just his admitted use of medical marijuana; TD had a "Bipolar II Disorder and Major Depressive with postpartum onset" psychological diagnosis; and both TD and respondent-father engaged in domestic violence with each other. Respondent-father was present at the hearing held the day after the children were removed. The trial court ordered, in relevant part, that respondent-father be given supervised parenting time with KP, which could be simultaneous with TD's parenting time, and that both should receive the "additional" time afforded to parents of infants.

Throughout the proceedings, respondent-father was treated as effectively KP's father, despite BD still initially being KP's legal father. It was explained that the only thing that could not be done for respondent-father until he established legal paternity was to provide him with his own treatment plan independent of TD. Respondent-father continued to receive the same parenting time as TD and was given the same referrals and offered the same services. For unknown reasons, possibly due to difficulty contacting BD due to his incarceration in South Carolina, respondent-father was not formally determined to be KP's legal father until May 30, 2019. For further unknown reasons, despite holding a hearing on a new petition against respondent-father on June 12, 2019, respondent-father was formally ruled to be a respondent in this matter on August 7, 2019. Respondent-father elected to continue a joint treatment plan with TD until at least January 2020 when they ended their relationship, and even thereafter they wished to continue joint parenting time visits.

As noted, there had never been any apparent doubt that respondent-father's parentage of KP was an inevitable formality. Although the initial petition was only against TD, respondent-father and TD lived together and respondent-father was included in essentially everything. From the outset, case workers were concerned by some aspects of respondent-father's home being unsuitable, but primarily they were concerned that respondent-father was also abusing drugs. He was noted to be slurring his speech and falling asleep during conversations, and later during some parenting time sessions. Respondent-father initially declined drug screens because he felt them to be unnecessary, which case workers found concerning. After one instance of respondent-father falling asleep during a parenting time visit, respondent-father was promptly drug screened and fount to have "quite high" levels of methamphetamine. Respondent-father was also noted to have issues with anger.

TD and respondent-father were both referred to a number of services, including parenting classes, domestic violence services, psychological evaluations, and drug treatment. Initially, they were both discharged for failing to attend. Both TD and respondent-father consistently either missed drug screens or were found to be positive for amphetamine and methamphetamine, with the sole exception of one month during which respondent-father only tested positive for THC.[2] Both TD and respondent-father admitted to having drug addictions, but respondent father

---

[2] It was recognized that marijuana was legal, but the case worker emphasized that petitioner's policy was to ask parents who had drug addiction problems to refrain from using certain addictive substances, such as marijuana and alcohol, even if those substances were legal.

consistently refused to acknowledge that his drug addiction had any practical effect on his parenting ability.

Nevertheless, when TD and respondent-father visited KP, they interacted appropriately with the child. However, they struggled with showing up to morning visits and were usually late. TD and respondent-father did eventually complete parenting skills classes, but petitioner remained concerned whether they could safely parent KP on a full-time basis or under the influence of methamphetamines. Respondent-father declined to participate in recommended NA/AA meetings, and both parents continued to struggle with anger and emotional self-control issues. Although respondent-father made some claims about attending various treatment programs, the case worker was unable to find evidence that he did, in fact, actually attend. Respondent-father obtained a therapist, who reported concerns with blaming behavior and not owning up to his own weaknesses. After the one month staying clean,[3] both parents resumed testing positive for amphetamines and methamphetamines. Petitioner then sought termination.

At a hearing on December 10, 2019, the case worker summarized that respondent-father had been involved in the case from the outset and knew what was expected of him long before he formally became a respondent, and he had been offered all of the same services offered to BD. She was pleased that respondent-father was making some progress in therapy, but remained concerned that he was not taking responsibility. She contended that the main issue was respondent-father's substance abuse, and if he participated in substance abuse treatment and gave consistently clean screens between then and the next hearing, she might reconsider her recommendation of termination. Further substance abuse treatment remained available, and the trial court informed respondent-father and TD that it would not return KP "to two regular meth users under these circumstances" unless they availed themselves of treatment.

At the termination hearing on March 3, 2020, the case worker testified that TD and respondent-father had ended their relationship in January, but continued to live together for a time. They had recently decided they wanted separate treatment plans, but they nevertheless wanted to continue joint parenting time visits. She recounted that she had always treated him as if he was the legal father from the outset, and she offered him all available services throughout the case. The parents' separation did not change the agency's plans, because they were still engaging in joint visitations, and the services they had been offered throughout the proceedings had always been independent. The case worker summarized respondent-father's history of testing positive for amphetamines and methamphetamines, refusal to attend AA or NA meetings, "sporadic" and ineffective engagement with intensive outpatient programs, and failure to follow through on referrals to inpatient programs. She had recently obtained authorization to place him in several inpatient programs, but as of the date of the hearing, respondent-father was pending on a wait-list; nevertheless, similar referrals had been made from the outset that he had declined.

The case worker further explained that respondent-father recognized that he was addicted to methamphetamines, but he refused to accept that his substance use negatively impacted his life

---

[3] The trial court commended the parents for being clean from drugs at that time, but expressed concern that they had previously only put in minimal effort, and it observed that many drug users could "white-knuckle it" for a time only to relapse once a motivation or confinement is removed.

or his ability to be a safe parent, and on one occasion he stated "that he wouldn't be using substances if we hadn't taken his child away from him." She opined that respondent-father continued to believe that his substance use was not an impediment to being able to care for KP. Respondent-father always blamed someone else or provided fictitious excuses for his tardiness to visits with KP, lack of participation in services, and use of drugs. The case worker also opined that respondent-father was actually very intelligent and had shown himself capable of being a good parent, but he lacked emotional stability and could not benefit from services because he refused to acknowledge that he had a problem.[4]

Meanwhile, KP had been placed with her paternal uncle, who wished to adopt KP, and KP was doing very well in that placement and being provided with the stability the child needed. There was no doubt that both parents loved KP and expressed appropriate affection, but KP remained in danger due to both parents' continued substance use. Given both parents' history, if either of them immediately expressed a desire to finally take their treatment seriously, the agency would need to see at least nine months to a year of full participation before it could rely on them truly achieving stability. KP was, by then, more than 17 months old and had been in care for almost her entire life. The trial court entered an order terminating both parents' parental rights to KP.

## II. STANDARD OF REVIEW

"To terminate parental rights, a trial court must find by clear and convincing evidence that at least one statutory ground under MCL 712A.19b(3) has been established." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013)). The trial court must also find termination in the child's best interests by a preponderance of the evidence. *Id*. at 80, 83-90. This Court reviews the trial court's factual findings for clear error. *In re BZ*, 264 Mich App 286, 296; 690 NW2d 505 (2004). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App at 80 (citation and quotation marks omitted). Whether petitioner made reasonable efforts to reunify a child with a parent and to rectify the conditions that initially led to the child's removal is also a question of fact that this Court reviews for clear error. *In re Smith*, 324 Mich App 28, 43; 919 NW2d 427 (2018). Because establishment of only one statutory ground is necessary, erroneous termination on one ground is harmless if another ground was also properly established. *In re Powers Minors*, 244 Mich App 111, 118; 624 NW2d 472 (2000). Parental rights may not be terminated on the basis of being a victim of domestic violence, but may be based on being a perpetrator of domestic violence. *In re Plump*, 294 Mich App 270, 273; 817 NW2d 119 (2011). In general, a trial court's conclusions of law are reviewed de novo. *Chapdelaine v Sochocki*, 247 Mich App 167, 169; 635 NW2d 339 (2001).

---

[4] The case worker also noted outstanding concerns with domestic violence, including respondent-father's persistence in regarding himself as only a victim rather than also a perpetrator, and failure to verify an income; but she emphasized that the latter was a relatively minor issue and his drug use was the primary issue.

### III. STATUTORY GROUNDS FOR TERMINATION

We note at the outset that respondent-father does not offer any clear challenge the trial court's factual findings or determination as to specific grounds for termination. Any such challenge could therefore be considered waived or abandoned. See *In re ASF*, 311 Mich App 420, 440; 876 NW2d 253 (2015). Rather, as will be discussed, respondent-father's arguments on appeal pertain to the unusual procedures in this matter and the delay in formally adjudicating him as KP's legal father and as a respondent.

We observe, in any event, that KP was removed from respondent-father's care because of his abuse of a dangerous and illegal drug, methamphetamine; and respondent father proved himself incapable of ceasing to use methamphetamine. Even counting from the date of respondent-father's procedurally-unusual late adjudication as a parent, more than 182 days had elapsed, and respondent-father had been offered extensive services for months previously. Although respondent-father never really documented his income, it was not in serious doubt that he did have an income. Nonetheless, his conduct clearly showed that there was no likelihood that he could stop using methamphetamine at all, and even if he did, he would need to prove himself clean for nine months to a year. Otherwise, his persistent use of methamphetamine clearly showed that the conditions that led to adjudication continued to exist and would continue to do so, there was no reasonable likelihood he could provide proper care and custody, and it was highly likely KP would be harmed if returned to his home.

We find no clear error in the trial court's finding that statutory grounds under MCL 712A.19b(3)(c)(i), (g), and (j) were established by clear and convincing evidence.

### IV. REASONABLE EFFORTS AND SUFFICIENT TIME

Respondent-father argues that termination was inappropriate because it was premature given the delay in formally involving him in this matter. He also points out, accurately, that there was a strong bond between himself and KP. He also argues that he displayed appropriate parenting during visits, which is only partially true: the evidence showed that he frequently arrived late, sometimes not at all, and was observed essentially passing out during many visits. Nonetheless, respondent-father did display appropriate parenting to the extent he was actually or effectively present. His argument, however, implicitly hinges entirely on elevating formality over substance: that none of the extensive array of services he was offered before his *formal* adjudication as a parent "count." We disagree.

As a practical matter, the evidence unambiguously showed that there was never any doubt that respondent-father was KP's father, that he was always treated as such, and that he was offered the entire panoply of services that *could* be offered from the outset of the proceedings. The only practical, rather than strictly technical, difference that his adjudication as a father made was that he could—if he chose—have an individual treatment plan instead of a joint treatment plan with KP's mother. Notably, respondent-father did *not* choose to pursue an individual treatment plan until long after he was formally adjudicated as a parent. At most, he makes the argument that he had little motive to comply with services because he did not technically have any rights—which is simply absurd, given that everyone was treating him as the father all along. Furthermore, the evidence that he has a problem with blaming others for his problems and an inability to take

personal responsibility makes his lack of formal adjudication at most an excuse; and not, we think, a very good one.

The fact is that respondent simply *chose* not to avail himself of many of the services he was offered, and he simply failed to benefit from most of the remaining services. The record shows that he even recognized that he was addicted to methamphetamines. He further recognized that stopping his use of drugs was a requirement for having KP returned, even if he did not understand why. Whether he did not take that need seriously or he simply was not capable of quitting is largely immaterial: ultimately, he failed to benefit from the services despite having many services available. The record shows beyond any doubt that respondent-father was offered extensive—and more than reasonable—services throughout the proceedings. The fact that he was treated as the father even in the absence of a formal adjudication reinforces that petitioner's efforts were reasonable.

To the extent respondent-father argues that termination should not have been sought under MCL 712A.19a(6), it appears that respondent-father meant to refer to MCL 712A.19a(8), which provides:

> If the court determines at a permanency planning hearing that a child should not be returned to his or her parent, the court may order the agency to initiate proceedings to terminate parental rights. Except as otherwise provided in this subsection, if the child has been in foster care under the responsibility of the state for 15 of the most recent 22 months, the court shall order the agency to initiate proceedings to terminate parental rights. The court is not required to order the agency to initiate proceedings to terminate parental rights if 1 or more of the following apply:
>
> (a) The child is being cared for by relatives.
>
> (b) The case service plan documents a compelling reason for determining that filing a petition to terminate parental rights would not be in the best interest of the child. Compelling reasons for not filing a petition to terminate parental rights include, but are not limited to, all of the following:
>
> > (i) Adoption is not the appropriate permanency goal for the child.
> >
> > (ii) No grounds to file a petition to terminate parental rights exist.
> >
> > (iii) The child is an unaccompanied refugee minor as defined in 45 CFR 400.111.
> >
> > (iv) There are international legal obligations or compelling foreign policy reasons that preclude terminating parental rights.
>
> (c) The state has not provided the child's family, consistent with the time period in the case service plan, with the services the state considers necessary for the child's safe return to his or her home, if reasonable efforts are required.

Respondent-father appears to believe that this case involved the obligation to initiate termination proceedings due to the length of time the child had been in foster care, but nothing in the record suggests that was a basis for pursuing termination. Respondent-father also relies on MCL 712A.19a(8)(b), arguing that "compelling reasons" exist, but such reliance seems irrelevant based on the fact that KP was being cared for by a relative, so MCL 712A.19a(8)(a) would seem more obviously applicable. In any event, respondent-father only argues that "compelling reasons" exist because he had not been provided sufficient time to engage with services, which, as discussed above, is blatantly untrue.

Ultimately, respondent-father simply fails to address the central concern: whether he would be capable of being a safe and appropriate parent on an ongoing basis, for more than a few scheduled and supervised hours a week. Respondent-father argues that he was working toward making the necessary improvements, but the record reflects that he was either not very serious about doing so or not truly capable of making those improvements. Respondent-father appears to presume that he would have successfully completed an inpatient treatment program, but fails to appreciate that he would still have had to demonstrate that he could *stay* clean thereafter. Meanwhile, KP had been in care for most of her life and needed stability and finality. The trial court did not clearly err in finding that respondent-father's demonstrated inability to recognize the hazards of his methamphetamine use made termination of respondent-father's parental rights in KP's best interests.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Jane E. Markey
/s/ Stephen L. Borrello

-7-