*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* M KUBITSKEY, Minor.

UNPUBLISHED
December 15, 2022

No. 360767
Mecosta Circuit Court
Family Division
LC No. 20-006612-NA

Before: GLEICHER, C.J., and MARKEY and RICK, JJ.

PER CURIAM.

Respondent-mother appeals by right the trial court order terminating her parental rights to her minor child, MK, under MCL 712A.19(b)(3)(c)(*i*) (failure to rectify the conditions leading to adjudication), and (j) (reasonable likelihood of harm to the child if returned to the parent).[1] We affirm.

## I. BACKGROUND

The children were removed from respondent's care after they were found at respondent's home with no supervision during a wellness check. Respondent left the children to purchase alcohol. Respondent was arrested and convicted of fourth-degree child abuse as a result. The Department of Health and Human Services (the Department) subsequently filed a petition, and MK was placed in a foster home. After respondent's release from jail, the Department provided her with a Parent Agency Treatment plan, with which the trial court ordered respondent to comply. Respondent was required to address her emotional stability, improve parenting skills, communicate with the Department, and to obtain and maintain stable housing and employment. Respondent completed some of the services. However, she failed to obtain and maintain consistent

---

[1] The parental rights of MK's putative father were also terminated during these proceedings, but he not a party to this appeal. Unless otherwise indicated, "respondent" as used in this opinion refers to respondent-mother only. Additionally, respondent's younger son, MK2, was also removed from respondent's care in this case. However, respondent's parental rights to MK2 were not terminated and, therefore, it is not an issue in this appeal. "Children" refer to both MK and MK2 in this opinion.

employment and suitable housing or show that she benefited from services. The trial court found clear and convincing evidence to terminate respondent's parental rights, and that termination was in the best interests of the child.

This appeal followed.

## II. STATUTORY GROUNDS

Respondent first argues that the trial court erred by finding that a statutory ground existed to terminate her parental rights under MCL 712A.19b(3)(c)(*i*) or (j). We disagree.

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re Smith*, 324 Mich App 28, 46; 919 NW2d 427 (2018) (quotation marks and citation omitted). This Court reviews for clear error the trial court's finding that there are statutory grounds for termination of a respondent's parental rights. *Id*. "A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made." *Id*. at 43 (quotation marks and citation omitted). Moreover, "[a]ppellate courts are obliged to defer to a trial court's factual findings at termination proceedings if those findings do not constitute clear error." *In re Sanborn*, 337 Mich App 252, 273; 976 NW2d 44 (2021) (quotation marks and citation omitted). "If the trial court did not clearly err by finding one statutory ground existed, then that one ground is sufficient to affirm the termination of respondent's parental rights." *Id*. "Further, regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." *In re Ellis*, 294 Mich App 30, 33; 817 NW2d 111 (2011).

Grounds for termination exist under MCL 712A.19b(3)(c)(*i*) if "182 or more days have elapsed since the issuance of an initial dispositional order" and "[t]he conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." It is undisputed that more than 182 days had passed since the initial dispositional order. Here, the children were removed from respondent's care in January 2020, and the court entered the first dispositional order in March 2020. Respondent's parental rights were terminated in March 2022.

The trial court found that the barriers of emotional stability, parenting skills, housing, and employment continued to exist. The Department offered respondent services to rectify those conditions, including counseling and supervised parenting time with parenting-skills education. The Department also provided respondent assistance with finding suitable housing. Although respondent participated in the majority of the services, "mere participation is not the same as overcoming the barriers in place." *In re Sanborn*, 337 Mich App 252, 274; 976 NW2d 44 (2021). Despite respondent showing a period of stability with housing, parenting skills, employment, and emotional stability, she lost the progress she gained in May 2021.

Respondent participated in approximately 150 supervised visitations with hands-on parenting education throughout the case. However, she failed to adequately apply what she learned and failed to show that she benefited from services. This is evidenced by respondent's use of foul language toward the children and threatening to leave visitation early when she was frustrated by

the children's behavior in the months preceding termination. On multiple occasions, respondent made promises to MK of his returning to her care, and MK was distraught when they did not come true. When respondent threatened to leave visitation early, MK was upset and it negatively affected his behavior for days following the visit. Respondent failed to appreciate or understand the traumatic effects of her statements, and she continued to have inappropriate conversations with her children despite the issue being addressed by service providers and the Department. Respondent also consistently relied on service providers or relatives to help her care for the children and mediate her frustration during parenting time. In the months leading up to the termination, there were instances where respondent refused to engage with the children at all.

Significantly, respondent continued to put her own needs above those of MK. For example, when MK was struggling in school, respondent was resistant to his being evaluated for an Individualized Education Program (IEP).[2] Respondent explained that she was concerned that MK would be diagnosed with attention-deficit hyperactivity disorder (ADHD), the same condition that she had, and she did not want to think about it. Respondent was also resistant to MK's taking prescribed ADHD medication because she feared it would negatively impact MK. However, respondent failed to participate in MK's medical and educational decisions. Respondent only attended one IEP meeting with MK's school and foster family, and she was not forthcoming with information during the evaluation process. Respondent also continued to blame MK's behavioral and academic issues, at least in part, on his removal from her care and asserted that the issues would be resolved if he was returned to her care. Additionally, respondent delayed signing the necessary IEP paper work in order for MK to be evaluated because she "knew" MK had a learning disability and needed to "process it," despite recognizing that it was in MK's best interest to be evaluated in order to get the help he needed.

Respondent continued to have issues with emotional stability during parenting time. A Family Supportive Services worker, who supervised nearly all of respondent's parenting time, testified that respondent and MK were on a "similar" emotional level and that they could not talk to each other when they were both upset. Throughout the case, respondent would become agitated, frustrated, and upset with service providers and her children. Respondent would often abruptly leave a meeting or hang up during a call with the Department and service providers. Respondent also threatened to end parenting time early on multiple occasions when she became frustrated. Moreover, respondent refused to take accountability and blamed others during "difficult" conversations about MK. The Department and service providers could not recommend unsupervised visitation during the case because respondent failed to maintain consistent stability.

Respondent participated in mental health counseling for the majority of the case. There was an approximately six month period when respondent failed to participate in services. Respondent claims the Department failed to assist her with finding counseling services after she

---

[2] An Individualized Education Program (IEP) includes a process that evaluates children to determine if they need special education and related services and, if the child is eligible, establishes how services will be provided. U.S. Department of Education, *A guide to the Individualized Education Program*, https://www2.ed.gov/parents/needs/speced/iepguide/index.html#process (accessed November 22, 2022).

moved. However, the record indicates that assistance was offered by the Department and other services providers on numerous occasions, but respondent refused it. Additionally, given her recalcitrance, respondent's therapist was unable to opine on respondent's progress from counseling and whether she was more stable as a result. Testimony revealed that respondent was not forthcoming about her own mental health diagnosis with her therapist. Moreover, the testimony from the Department, service providers, MK's foster family, and respondent's sister indicate that respondent continued to struggle with emotional stability throughout the case. Further, respondent testified that she had difficulty communicating with the Department because there were some things she did not want to hear about MK. Respondent also failed to complete a substance-abuse assessment, despite the court ordering her to do so.

Respondent's inability to obtain and keep stable housing and employment also remained a barrier. During the pendency of the case, respondent had moved, lost, or lived in unstable housing eight times. She also held at least five different jobs. At the time of trial, respondent lived in a camper with heat and no running water. Respondent asserted that she had access to water in the house next to it. The Department found that it was inadequate for reunification. Respondent also never provided the location or address of the camper in order for the Department to complete a home study. Respondent admitted that her current camper was deemed inappropriate for MK, but she had no plans to move. Respondent further claimed that the Department did not assist her with finding housing, despite the record indicating that she was offered assistance multiple times. Additionally, at the time of the termination trial, respondent testified that she had obtained full-time employment. However, she had been unemployed for approximately four months prior, and she had only been consistently employed for approximately 9 of the 22 months of the entire case.

Respondent argues that there was no evidence that she could not have rectified the conditions given the age of the child, and she had shown that she could make progress. However, the inquiry is whether "there is no reasonable likelihood that the conditions will be rectified within a reasonable time *considering the child's age*." MCL 712A.19b(3)(c)(*i*) (emphasis added). The Department removed MK from respondent in January 2020, and respondent received services for approximately two years. Although respondent had a period of stability during the case, she failed to maintain it and continued to lose progress. Despite receiving and participating in services, respondent continued to struggle with regulating her emotions and putting the needs of MK—particularly MK's educational needs—before her own. MK's therapist testified that he had issues related to trauma, attachment, and expressing emotions, in part because respondent had left MK alone with his sibling. MK was also very critical of himself and struggled with self-esteem. While MK made progress, he required more counseling, and at the time of the termination trial, MK was not ready to have counseling sessions with respondent, which would be required before reunification. It was unknown when that would be able to occur. The therapist also testified that respondent's use of swear words and name calling could negatively impact MK's self-esteem.

Considering the entire record, the court did not err by finding statutory grounds to terminate respondent's parental rights under MCL 712A.19b(3)(c)(*i*).[3]

## III. BEST INTERESTS

Respondent also challenge's the trial court's findings with regard to whether termination was in the child's best interests. This Court reviews for clear error a trial court's best-interest determination. *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009). Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). On appeal, this Court "must defer to the special ability of the trial court to judge the credibility of witnesses." *In re Medina*, 317 Mich App 219, 227; 894 NW2d 653 (2016) (quotation marks and citation omitted); see MCR 2.613(C).

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts,* 297 Mich App 35, 40; 823 NW2d 144 (2012).

> In making its best-interest determination, the trial court may consider the whole record, including evidence introduced by any party. The child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home, are all factors for the court to consider when deciding whether termination is in the best interests of the child. The trial court may also consider the child's age, inappropriate parenting techniques, and continued involvement in domestic violence. It may further consider visitation history, the parent's engaging in questionable relationships, the parent's compliance with treatment plans, the child's well-being in care, and the possibility of adoption. [*In re Sanborn*, 337 Mich App at 276-277 (cleaned up).]

A preponderance of the evidence supported a finding that termination of respondent's parental rights was in the child's best interests. The court noted that respondent received services for approximately two years but failed to benefit from them. The court recognized that MK was bonded with respondent, but that the bond was more of a "friend," and respondent failed to demonstrate the willingness or ability to address her own barriers. Because she refused to address her barriers, the court found that respondent only possessed the capacity to provide the child with love and affection. As explained earlier in this opinion, respondent did not make any significant progress addressing her mental health needs and emotional stability, and she failed to demonstrate that she could put MK's needs over her own. Respondent was resistant to MK's being evaluated for learning disabilities and medication despite acknowledging that they could benefit MK. Despite her concerns, respondent did not reach out to any of MK's doctors or therapist to determine

---

[3] Because we conclude that the trial court did not clearly err in respect to this statutory ground, we need not address the statutory ground under MCL 712A.19b(3)(j). See *In re Sanborn*, 337 Mich App at 275 n 5.

the risks—rather, her concerns were solely based on her own experiences. Respondent also wished to buy MK a "therapy dog" without speaking with any of MK's therapists, doctors, or teachers to determine whether a dog would be helpful or benefit him. Moreover, respondent also testified that she did not want to know where MK attended school because she feared she might essentially kidnap him.

Respondent also lacked accountability. Respondent continued to blame the Department for her lack of progress. She also blamed MK's behavioral issues on the removal itself. Respondent further failed to comprehend why the Department requested termination of her rights. Respondent believed it was because she did not have stable housing, did not "look stable enough," and was labeled as an "alcoholic." Respondent's statements indicate that she lacked insight or accountability into her actions that led to MK's removal, and that she failed to understand the barriers to reunification despite receiving services and assistance from the Department for approximately two years. According to her therapist, respondent identified housing as the primary barrier to reunification. Although the court was concerned about respondent's prior alcohol abuse, respondent did not complete a substance abuse evaluation and it was not a primary focus of her therapy. Significantly, respondent did not disclose her diagnosis of borderline personality disorder or psychological evaluation and recommendations with her therapist. While respondent's therapist testified that respondent showed some insight and improvements around her goals, the therapist could not opine on respondent's progress or stability at the time of trial. Additionally, in the months before her rights were terminated, respondent continued to use swear words toward her children and threatened to end parenting time early despite being informed of how those statements could negatively impact her children. There was also testimony that conversations between respondent and MK were driven by respondent's needs rather than those of MK, and that she continued to have inappropriate conversations with her children despite parenting classes and hand-on education.

The court also considered the child's need for permanency, stability, and finality. Considering how long the child was in foster care and how long the child might have to wait for respondent to rectify the conditions that still existed, this was a factor that weighed heavily in favor of termination. MK had been in foster care for approximately two years. His foster family provided a safe and stable home and were willing to adopt him. MK's foster family, therapist, and teacher all testified that respondent had improved and progressed while in foster care. The testimony indicated that MK made progress in part because he had a good routine with his foster family. The court found that, if MK were to be reunified with respondent, there would likely be no routine within any sort of reasonable time. The record shows that respondent failed to understand how her actions impacted MK emotionally, and respondent failed to show consistent stability, which a routine would require. Based on the entire record, the court did not clearly err by finding that respondent's stability remained an issue at the time of the trial and that respondent failed to demonstrate the ability to change or make progress. Further, there was no indication how long MK would have to wait for respondent to rectify the conditions, which weighed in favor of termination. See *In re Sanborn*, 337 Mich App 278.

Respondent also complains that the Department never conducted a home study of her most recent home. However, respondent never provided the location or address to the Department. Additionally, despite acknowledging that her most recent home was deemed inappropriate for reunification, respondent had no plan to move to an appropriate home. Respondent also asserts

that the trial court erred by not considering relative placement with the maternal grandmother as an alternative to termination. The record indicates that respondent refused to agree to a relative placement with the maternal grandmother at the beginning of the case. Nonetheless, the Department investigated and concluded that it was not a suitable placement because the grandmother was essentially homeless. Respondent was uncooperative in identifying other potential relative placements, and ultimately, the Department was not able to find a suitable relative placement.

In conclusion, we are not left with a definite and firm conviction that a mistake was made, and the trial court did not clearly err by finding that termination was in the best interests of MK. See *In re Smith*, 324 Mich App at 43.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Jane E. Markey
/s/ Michelle M. Rick

-7-