*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* LEVINS, Minors.

UNPUBLISHED
June 23, 2022

No. 357555
Macomb Circuit Court
Family Division
LC Nos. 2019-000019-NA
2019-000092-NA
2019-000165-NA

Before: BOONSTRA, P.J., and GADOLA and HOOD, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating her parental rights to her three children, ML,[1] JL, and DL, under MCL 712A.19b(3)(b)(*ii*). We affirm.

## I. BACKGROUND

This child protective proceeding was initiated following allegations that, in 2018, respondent's boyfriend, John Patrick Moore, sexually abused respondent's then 14-year-old daughter, ML. Moore, who lived in the same apartment complex as respondent and her daughters, was a convicted sex offender. In February 2018, respondent started dating Moore and, in May 2018, respondent invited him to move in with her and her daughters. The same day Moore's name

---

[1] We acknowledge that ML turned 18 years old during the pendency of this appeal. Although ML is now 18 years old, and there are no longer any parental rights to restore, the fact that respondent's parental rights to ML were terminated may have collateral consequences for respondent should she give birth to another child. See *In re Smith*, 324 Mich App 28, 31, 41-43; 919 NW2d 427 (2018) (holding that despite the death of a child while an appeal was pending, the appeal was not moot because a respondent may face collateral legal consequences as a result of the termination, including termination of the respondent's parental rights to another child and in determining whether the Michigan Department of Health and Human Services must provide reunification services if another child is removed from the respondent's care). Accordingly, we conclude that any challenge to the termination of respondent's parental rights is not moot.

was added to respondent's lease, Children's Protective Services (CPS) and police arrived at respondent's apartment to investigate a complaint of sexual abuse involving Moore and ML. At the time, CPS informed respondent that Moore was a registered sex offender. Respondent already knew Moore's sex offender status—he had told her himself—but she believed she had no reason to be concerned. CPS informed respondent that Moore was a risk to the children, and if anything happened, CPS would hold her accountable.

At the same time, CPS implemented a safety plan requiring the children to be removed from the home. Respondent admitted that she was given the option of removing the children or removing Moore. Respondent requested that CPS remove the children, believing that Moore had no place to live and that the removal was only temporary. CPS initially placed ML and JL with a maternal uncle, then the maternal grandparents, and finally with a lifelong friend of respondent, Jessica Howard. Although respondent believed that Moore could not have unsupervised visits with ML and JL, she did not believe he was precluded from having any contact with her daughters. A CPS investigator testified, however, that respondent was informed Moore could not have any contact with the children, and that she could not leave the state with them. In early June 2018, respondent picked up ML and JL at Howard's house to transport them to school. But instead, respondent decided that the children would skip school and travel to the Cleveland Zoo in Ohio. Moore accompanied respondent, ML, and JL on this trip.

Respondent did not share CPS's concerns about her cohabitation with Moore. She believed that during the first CPS visit, the police officer who accompanied the CPS investigator had "cleared" Moore. In her mind, that meant there was nothing for her to be concerned about. Respondent also believed it was okay to live with Moore even if he was on the sex offender registry.

In June 2018, ML underwent a forensic interview. During the interview, she denied that Moore sexually assaulted her and, consequently, CPS returned the children to respondent's care. After the interview, respondent asked ML and JL whether there was any inappropriate contact with Moore, but the two "swore up and down" that nothing had happened. The CPS investigation revealed certain things that caused the investigator to believe Moore was grooming ML. JL reported that respondent walked in on ML and Moore cuddling or snuggling in the same bed while watching television. Respondent reported that both of them were fully clothed at the time of this event. She also reported to the CPS investigator that she spoke to Moore and ML about this incident and, after doing so, respondent believed that something like that would not happen again.

In August 2018, JL elected to reside with her biological father. In September 2018, Moore ended his relationship with respondent and moved out. Finding no reason to stay in Michigan, respondent and ML moved to South Carolina. Soon after their arrival, respondent discovered she was pregnant with Moore's child. Respondent informed Moore of her pregnancy, and the two eventually decided to reunite. Thus, in mid-November 2018, respondent and ML returned to Michigan and eventually moved in with Moore again.

In December 2018, respondent became concerned that Moore had a substance abuse problem. At some point that same month, Moore took respondent's car to run an errand but was gone the entire day. Respondent discovered that he was at a drug house in Detroit. When he returned, respondent confronted Moore and gave him the option to choose between drugs or having

a family. At the time, Moore indicated he was choosing family. But at the end of January 2019, Moore again took respondent's car and was gone for almost two days.

While Moore was gone this second time, respondent logged into Moore's computer and discovered child pornography on the computer and in the search history. Respondent testified that she was not certain whether she should take Moore's computer to the police because she had been in a relationship with him. She leaned toward turning over the computer to the police, but felt like a bad person doing so. At Howard's urging, respondent overcame her reluctance and brought the computer to the police. Respondent and ML also left the hotel they had been living in with Moore and moved in with Howard.

After the police received the computer and discovered that he had absconded from parole in Ohio, Moore was arrested. The police then advised respondent that they believed Moore and ML had been having sex. When respondent questioned ML about this, ML again denied that anything had happened between her and Moore. Knowing that they were close, respondent asked Howard to talk to ML. During the conversation that followed, ML disclosed to Howard that Moore had forced her to have sexual intercourse. Howard relayed this information to respondent, who then called the police. During a second forensic interview, ML disclosed that Moore sexually abused her.[2] And during the hearings on the petition to terminate parental rights, ML testified that Moore began sexually abusing her about a month after he and respondent started dating, and that it continued through the first six months of their relationship. ML testified that Moore sexually assaulted her 10 times, including once when respondent and ML returned to Michigan from South Carolina, and that the abuse always happened when respondent was absent from the home.

Petitioner, the Michigan Department of Health and Human Services (MDHHS), sought termination of respondent's parental rights to ML and JL at the initial disposition. The petition alleged, among other things, that respondent, despite having the opportunity to do so, failed to prevent the sexual abuse. While this case was pending below, respondent gave birth to Moore's son, DL. Thereafter, MDHHS sought termination of respondent's and Moore's parental rights to DL. The trial court found that the allegations in the petition regarding respondent's failure to prevent sexual abuse and likelihood of future abuse were established by clear and convincing evidence and, after considering the children's best interests, it terminated respondent's parental rights to all three children. This appeal followed.

## II. STANDARD OF REVIEW

Respondent's appeal challenges the trial court's findings regarding statutory grounds and best interest. In order to terminate parental rights, the trial court must find that at least one of the statutory grounds for termination has been established by clear and convincing evidence. *In re Gonzalez/Martinez*, 310 Mich App 426, 431; 871 NW2d 868 (2015). This Court reviews the trial court's findings under the clearly erroneous standard. *In re White*, 303 Mich App 701, 709; 846 NW2d 61 (2014); MCR 3.977(K). "A finding is clearly erroneous if, although there is evidence

---

[2] We note that this was not the first time ML was sexually abused. In 2005, when ML was two years old, her biological father sexually assaulted her.

to support it, this Court is left with a definite and firm conviction that a mistake has been made." *In re Ellis*, 294 Mich App 30, 33; 817 NW2d 111 (2011). When applying the clearly-erroneous standard in parental termination cases, "regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." *Id.*

Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court reviews for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009).

## III. STATUTORY GROUNDS

Respondent first argues that the trial court clearly erred when it terminated her parental rights under MCL 712A.19b(3)(b)(*ii*). We disagree.

## A. LAW

A trial court may terminate a parent's rights to a child under MCL 712A.19b(3)(b)(*ii*) if the following circumstances are proven by clear and convincing evidence:

> (b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:
>
> * * *
>
> (*ii*) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.

This statutory ground is intended to address a parent "who, while not the abuser, failed to protect the child from the other parent or nonparent adult who is an abuser." *In re LaFrance*, 306 Mich App 713, 725; 858 NW2d 143 (2012).

## B. ANALYSIS

The trial court did not clearly err when it found a statutory basis to terminate respondent's parental rights under MCL 712A.19b(3)(b)(*ii*). The record demonstrates that respondent had the opportunity to prevent the sexual abuse perpetrated against ML but failed to do so. Respondent knew very early in her relationship with Moore that he was a convicted sex offender. Moore informed her of this, but she dismissed the information as not concerning. Indeed, respondent believed it was okay to live with Moore even if he was on the sex offender registry. On the same day that respondent added Moore to the lease for her apartment, CPS informed respondent that Moore was a registered sex offender. CPS informed respondent of Moore's status in the context of new sexual assault allegations involving Moore and ML and his apparent failure to update his sex offender registration as required. CPS also told respondent that Moore was a risk of harm to her children and that she would be held responsible if any of the children were abused. To further reinforce this warning, shortly after respondent introduced Moore to Howard, Howard expressed

concern about the children's safety and reminded respondent that her children could be taken away from her. Respondent was also informed that Moore could not have any contact with the children, and that she could not leave the state with the children. Despite these warnings, respondent not only continued to live with Moore, but also allowed him to have unsupervised contact with her children. Respondent also left Michigan with Moore and the children to visit the Cleveland Zoo. When MDHHS discovered that respondent and her children were living with a registered sex offender, a safety plan was put in place that precluded Moore from having any contact, supervised or otherwise, with the children. Respondent did not comply with the safety plan and repeatedly allowed Moore to have unsupervised access to the children.

In addition to being forewarned of an obvious risk, there were other warning signs that respondent disregarded. JL reported that respondent walked in on ML and Moore cuddling or snuggling in the same bed, while watching television. When the CPS investigator asked about this incident, respondent asserted that both of them were fully clothed. Respondent also told the investigator that, after speaking to Moore and ML, she did not believe that something like that would happen again. Respondent witnessed signs of grooming that she simply chose to ignore. This is particularly concerning because respondent knew from the beginning of her relationship with Moore that he was a convicted sex offender.

Respondent argues that she had no reason to believe that Moore was a risk to her children. She notes that there were no pending charges against him, that law enforcement had "cleared" him to be in the home, and that ML had denied she was abused. Indeed, respondent represents that the authorities had assured her that she need not be concerned. The record belies this assertion. The authorities consistently warned respondent that Moore was a risk to her children. Respondent could not have reasonably concluded that law enforcement had "cleared" Moore to be in the home when the police officer who accompanied CPS to the May 2018 investigatory visit indicated that respondent would be arrested if she did not agree to the safety plan. Respondent's asserted belief that Moore was not a risk to the children was simply unreasonable under the circumstances.

Respondent knew the risk of harm. The warnings came from multiple sources—including the boyfriend who perpetrated the abuse. Nonetheless, respondent left her teenage daughters alone with a convicted sex offender, who ultimately sexually assaulted ML multiple times. There was clear and convincing evidence that respondent was in a position to prevent the abuse, yet failed to do so. Accordingly, the trial court did not err when it found that the first prong of MCL 712A.19b(3)(b)(*ii*)—that respondent had the opportunity to prevent the sexual abuse but failed to do so—was met.

Moreover, the trial court did not clearly err when it concluded that the second requirement of MCL 712A.19b(3)(b)(*ii*)—that there was a reasonable likelihood respondent's children would suffer abuse in the foreseeable future if placed in her home—was also met. Clear and convincing evidence demonstrated that there was a reasonable likelihood respondent's children would suffer abuse in the foreseeable future if placed in her home. The evidence showed that respondent was unable to appreciate obvious and known risks of harm to her children. She ignored warnings from multiple sources and allowed a convicted sex offender to have unsupervised access to her teenage daughters. The CPS investigators and foster care workers all believed that respondent was not capable of protecting her children. Howard and ML testified similarly. ML testified that she was "afraid that [respondent] may bring a[nother] guy into the house and he'll rape me again." She

also expressed concerns for JL's safety. There was testimony that respondent also failed to comply with the various safety plans implemented throughout the case. Further, respondent had a history of quickly entering relationships with men she barely knew, and on at least two occasions these men were invited to live in the home with her and the children.

Evidence of respondent's response to finding child pornography on Moore's computer is also supported the trial judge's conclusions. Although she eventually contacted the police, she internally struggled with that decision and thought she would be a bad person for reporting Moore. Ultimately, Howard persuaded respondent to contact law enforcement. Respondent's own testimony also indicated that she continues to believe that she could not have known of the risk to her children. This position further supports the conclusion that the children would be at risk of abuse in the foreseeable future if returned to respondent's home. Considering the totality of the evidence, the trial court did not clearly err when it found clear and convincing evidence to terminate respondent's parental rights under MCL 712A.19b(3)(b)(*ii*).

## IV. BEST INTERESTS

Respondent also argues that the trial court clearly erred by finding that termination of her parental rights was in the children's best interests. We disagree.

## A. LAW

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of the parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). The court may consider several factors when deciding if termination of parental rights is in a child's best interests, including the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. *In re Olive/Metts*, 297 Mich App 35, 42; 823 NW2d 144 (2012). The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. *In re Jones*, 286 Mich App at 131. "The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App at 713. In considering the child's best interests, the trial court's focus must be on the child and not the parent. *In re Moss*, 301 Mich App at 87. Further, the court must determine each child's best interests individually. *In re Olive/Metts*, 297 Mich App at 42. But a trial court need not make redundant best-interest findings for each child when the best interests of the children do not significantly differ. *In re White*, 303 Mich App at 715-716.

## B. ANALYSIS

The trial court did not clearly err when it found that termination of respondent's parental rights was in each child's best interests. Respondent placed her own need for companionship above her children's safety. She exposed her two teenage daughters to a known sex offender, who then repeatedly abused ML. The children were all in stable placements and doing well in these homes. The trial court acknowledged that respondent loved her children, but there was clear and convincing evidence that she had not kept them safe in the past and that she would be unable to do so in the future.

-6-

Respondent argues that because ML was 17 years old when her parental rights were terminated, little was served by severing her legal connection to this child. ML, however, expressed a preference for having respondent's parental rights terminated. She felt that the matter had gone on for too long, and she wanted to heal and move on with her life. There was also testimony that the bond between respondent and ML was broken, in no small part because of the trauma the child had endured. Further, ML testified that she did not feel safe with respondent and there was evidence that ML attended parenting time not necessarily to see respondent, but to visit with her younger sister. Although ML was close to reaching adulthood, termination of respondent's parental rights provided ML with the finality she deserved for her mental and emotional well-being. Thus, the trial court did not clearly err in finding that termination of respondent's parental rights was in ML's best interest.

Nor did the trial court clearly err in finding that termination of respondent's parental rights was in JL's best interest. ML testified that she feared for JL's safety if JL were to remain with respondent. ML explained that she was concerned that once she left the home, "it might continue on and happen to" JL, presumably referring to future abuse. Moreover, throughout these proceedings, JL was living with her biological father. Respondent contends that this factor weighed against termination and that the trial court erred by failing to consider it when considering JL's best interests. "Indeed, a child's placement with relatives weighs against termination . . . ." *In re Mason*, 486 Mich 142, 164; 782 NW2d 747 (2010). Although the fact that a child is living with a relative must be considered, a trial court may still terminate parental rights in lieu of placement with a relative if it finds that termination is in the child's best interests. *In re Olive/Metts*, 297 Mich App at 43. In this case, the trial court noted that JL was living with and doing well in the home of her biological father. It was not required to do so, however. Because a biological father is not a "relative" as defined under MCL 712A.13a(1)(j), the trial court was not required to weigh JL's placement with her biological father against termination. *In re Schadler*, 315 Mich App 406, 413; 890 NW2d 676 (2016). Accordingly, the trial court did not clearly err in finding that termination of respondent's parental rights was in JL's best interests.

Finally, the trial court did not err when it found that termination of respondent's parental rights was in DL's best interests. DL was two years old at the time of termination. He had spent his entire life in foster care, and all but three months was spent in the home of fictive kin. DL suffered from a medical condition that required participation in occupational and physical therapy. He was also developmentally delayed and was being assessed to determine if he was on the Autism spectrum. While in her care, Howard ensured that DL received all of his medical care. Both she and ML questioned whether respondent was capable of doing the same. Caseworkers testified that a strong bond existed between Howard and DL and that no bond existed between respondent and her son. Finally, Howard testified that she wished to adopt DL. Considering these factors, we conclude that the trial court did not clearly err when it found that termination of respondent's parental rights was in DL's best interests.

Ultimately, it is in a child's best interests to be raised by a caregiver who can keep them safe from physical and emotional harm and who uses proper parental judgment. A preponderance of the evidence supports that respondent put her children at risk of abuse, that the abuse occurred,

and that the children would be at risk in the future. Accordingly, the trial court did not clearly err when it found that termination of respondent's parental rights was in the children's best interests.

We affirm.

/s/ Mark T. Boonstra
/s/ Michael F. Gadola
/s/ Noah P. Hood