*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* C. LEECK, Minor.

UNPUBLISHED
December 22, 2022

No. 360278
Clinton Circuit Court
Family Division
LC No. 20-029502-NA

Before: SHAPIRO, P.J., and BORRELLO and YATES, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court's order terminating her parental rights[1] to the minor child CL. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

The Department of Health and Human Services (DHHS) submitted a petition on July 8, 2020, seeking to remove the minor child, CL, from mother's care. According to the petition, CL's father was deceased. The petition alleged that it was contrary to the child's welfare to remain in the home with mother because mother had exposed the child to domestic violence, subjected the child to mental and physical abuse, and subjected the child to improper supervision and threatened harm due to mother's mental health and substance abuse issues. Mother was also currently incarcerated. The petition specifically alleged that there had been incidents of domestic violence between mother and her father in May 2020, which occurred in front of CL. It was also alleged that mother "verbally assaulted and charged at her Clinton County Probation Officer in front of [CL]" in May 2020, which led to a warrant for mother's arrest.

According to the petition, mother was arrested on July 4, 2020, following an incident during which she hit a police officer in front of CL. During the same incident, she had been screaming obscenities at CL and acting aggressively toward him. Mother allegedly had been diagnosed with anxiety disorder and bipolar disorder, had a substance abuse history involving

---

[1] The record indicates that the child's father is deceased. His parental rights are not at issue in this case.

alcohol and other drugs, was on felony probation for driving under the influence, and had significant child protective services (CPS) history involving domestic violence, mental health and substance abuse issues leading to improper supervision of the minor child, and physical abuse of the child.

CL was taken into protective custody, and an adjudication bench trial was subsequently held. Brian Brown, a police officer with the Dewitt Township Police Department, testified that around midnight on July 4, 2020, he responded to an apartment complex for a domestic dispute. When he arrived, mother and CL were outside the apartment building. Brown testified that mother was walking away from CL and was "in a very agitated state, yelling and screaming." According to Brown, mother's yelling and screaming included "a lot of derogatory terms, a lot of swear words," and mother referred to CL as "a little n****r." Brown asked mother to stop, and she turned around to face Brown and CL. Brown stated that mother had "her hands balled up in an aggressive manner." When Brown and his partner, Sergeant William Darnell, eventually attempted to arrest mother for disorderly conduct, she struggled and tried to "pull away." Mother was agitated and yelling at the police officers and CL throughout the incident. Brown testified that CL reacted to mother by "[c]rying, trying to explain himself."

Darnell testified that he arrived at the apartment complex after Brown. When Darnell arrived, he heard mother yelling and screaming. Darnell saw Brown standing between mother and CL, who was approximately seven or eight years old at the time. Darnell also testified that mother struggled and pulled away as he and Brown tried to arrest her.

According to Brown, after mother was in the police car, she "threatened to kill her son and [stated] that she had hoped he would burn in hell." Brown indicated that mother's behavior was consistent with that of a person who was emotionally or mentally unstable.

Charlotte Prochazka testified that she had been mother's probation officer based on an operating under the influence conviction. As part of her probation, mother was required to complete random drug screens. Mother was also participating in Alcoholics Anonymous (AA)/Narcotics Anonymous (NA) and outpatient treatment. On May 20, 2020, Prochazka met mother outside mother's apartment. During this meeting, Prochazka informed mother that in-person drug screening would resume June 1. Prochazka testified that as result, mother "became belligerent, aggressive, had a stance like she was going to tackle me, make fists, and yelled at me, yelled all kinds of names at me, and became—became aggressive towards me . . . ." The conversation continued. Because she felt intimidated by mother's behavior, Prochazka ran to her vehicle. Prochazka explained what happened next:

> [mother] charged at me in my vehicle. I immediately jumped in my vehicle and reminded her with my window down to check on her son who was out in the yard, approximately anywhere from 35 to 40 feet away playing in a parking lot with some rocks. It was an empty parking lot but it looked like it was the back side of a shopping mall. And she became very irate again, charged at my vehicle, and, again,

I told her you need to contact your Oakland County Probation[2] officer for further guidance, I am not going to be responding to you, and I—I actually left the scene. I would have called CPS but I didn't have my laptop with me, my contact information for that individual was not available to me.

An arrest warrant was issued for mother for violating the terms of her probation. Mother was found responsible and sentenced to 33 days in jail.

CPS worker Leslie Melvin testified that she first became involved with mother in May 2020, when she was assigned to investigate allegations involving an altercation between mother and her father. There were additional investigations continuing into July, including the July 4 incident described above. During her investigation, Melvin reviewed mother's CPS history and found that mother had been involved in eight CPS cases since 2013. Mother's earlier CPS history involved concerns about substance abuse, improper supervision, and mental health issues, and there was a pattern of improper supervision related to substance abuse. Mother had physically abused CL in 2016. During these previous cases, mother engaged in services that included inpatient treatment, services available in the community, in-home services, and mental health services.

According to Melvin, mother's past substance abuse involved alcohol and cocaine, but mother had been sober for nine months when Melvin first became involved with her in May 2020. At some point, mother had been diagnosed with anxiety and bipolar disorder, and she was prescribed medication. Mother admitted that at some point she had been taking her medication incorrectly and that she noticed a difference once she started correctly taking her medication. The trial court took judicial notice that mother had recently been sentenced in the district court to 60 days in jail for her attempting resisting and obstructing conviction.

The trial court found that statutory grounds for jurisdiction had been established by a preponderance of the evidence. The court specifically found that mother had been subject to multiple CPS investigations since 2013, reflecting a consistent concern about improper supervision due to substance abuse and mental health issues. The court also found that mother had not been properly taking her medication and that her behavior toward law enforcement in front of CL, which led to her arrest, demonstrated her emotional instability and need for mental health treatment. The trial court took jurisdiction.

At the close of the hearing, Foster-care worker Luke Hunter provided an update. Hunter stated that mother had voluntarily offered to do recommended services, which included parenting class, counseling, and medication management. CL was doing well in his foster-care placement.

Mother seemed to make progress over the next several months. There was testimony that mother completed all of her services, which included successfully completing her parenting class and a psychological evaluation. Mother was attending therapy and drug screens through her probation. She did not have any positive drug screens during this time. Visitation moved to

---

[2] Prochazka worked for the Clinton County Probation and Parole Office, but mother's conviction was from Oakland County.

supervised home visits and then unsupervised home visits and weekend visits. CL was transitioned home to mother's care in March 2021, and it appeared that the case would soon be closing.

However, at the next review hearing in June, Hunter testified that mother had been arrested on May 29 for "drunk and disorderly" and had also been "ticketed for loud and boisterous behavior." Mother claimed that a former boyfriend instigated the situation. Mother admitted that she had an alcohol dependency issue that needed to be resolved. According to Hunter, mother was going to enter a rehabilitation program to address her alcohol dependency. Mother's sister and father were going to care for CL while she was in rehabilitation. Hunter explained that he had not noticed any signs of alcohol use when he had visited mother and that he had not administered any drug screens. Mother had passed all of her drug tests through her probation. She had also been attending AA virtually. Mother completed the Family Recovery Program. Hunter stated that the recent arrest showed the continuation of mother's pattern; CL was initially removed in July 2020, following an incident where mother was drinking around a holiday and was arrested. The recommendation was to continue supervision of the case and to increase the frequency of drug testing. The lawyer-guardian ad litem informed the court:

> Your Honor, I'm very concerned about [CL]. The last time that I visited with him was just after this incident, and I am trying to talk with him and find out how he is doing, I didn't know that the arrest had happened. And while I'm talking to [CL], Ms. Leeck is sitting at the kitchen table and she is—with [CL] in the room, telling me all about how she is going to go into rehab, how she—how this incident happened and [CL] is looking at me, he's on the end of the couch and he's looking up at me and his eyes are just like, you know, what is happening here. And I felt so bad for him at that point and did not know that he had been removed at that point, was after that point to go with his aunt. I don't know how long that [mother] is going to be in rehab. I don't know where he is even to go visit him. I am concerned, and I would leave this in the Court's discretion.

The trial court found that reasonable reunification efforts had been made but that it was contrary to the child's welfare to remain in mother's care. The trial court ordered that CL would be placed in the care of the DHHS, that mother was to have supervised parenting time, and that the child was not to be returned to mother's custody without a court order. The trial court explained its findings specifically:

> So I have indicated that it's contrary to the welfare of the minor child to remain in the care of his mother because of her relapse with alcohol, failure to comply with AA requirements, arrest, and inappropriate conversations with the minor child. Therefore the minor child shall be removed from his mother's care and placed by DHHS. He shall not be returned to his mother's care without a court order . . . .

The next dispositional review and permanency planning hearing was held on September 9, 2021. William Whitman, who had replaced the previous foster-care worker, testified that CL was adjusting well to his aunt's home and was attending school. According to Whitman, mother was incarcerated for her probation violation and would not be released until January 2022. Whitman had attempted unsuccessfully to contact mother through the county jail. The trial court found that

-4-

proceedings to terminate mother's parental rights should be initiated because mother had not benefitted from services.

A petition to terminate mother's parental rights was subsequently filed, seeking termination under MCL 712A.19b(3)(c), (g), and (j). The petition alleged that mother had significant unresolved substance abuse issues, had previously engaged in inpatient rehabilitation services on multiple occasions, that mother relapsed on alcohol in May 2021, that mother was currently in inpatient substance abuse treatment, that mother had not demonstrated a consistent ability to maintain sobriety, that there were significant concerns about mother's emotional stability and mental health, and that mother was currently unemployed and homeless.

The termination hearing was held on January 12, 2022. Hunter testified about his involvement in the case as foster-care case manager, which began during the first week of July 2020, and ended in June 2021. Hunter became involved in the case because CL was removed from mother's custody following her arrest in July 2020, and subsequent "charge of child endangerment and abuse." Hunter stated that mother had reportedly been using alcohol around the time of the arrest. According to Hunter, the barriers to reunification that existed at the time of disposition involved mother's substance abuse and mental health, housing, and verbal and physical abuse.

Hunter explained that mother had a history of substance abuse that preceded the initiation of this case and that at the beginning of this case, she was on probation for a driving under the influence conviction. Hunter discussed mother's substance abuse issue with her, and she informed him that she was participating in AA. However, Hunter did not verify mother's participation in AA. Mother was participating in random drug and alcohol testing through the probation department, and all of her tests were negative. Hunter was not administering any additional drug testing to mother. Hunter testified that it became apparent that mother had nonetheless been continuing to consume alcohol as the case progressed closer to reunification when, around Memorial Day in 2021, mother was arrested for disorderly conduct and admitted that she had an alcohol problem and had been "drinking all along." Alcohol was a significant factor in the incident leading to mother's arrest, and CL was present when she was arrested. Mother voluntarily entered rehabilitation. She remained in the program for approximately 21 days, but she did not successfully complete the program because she withdrew to find another program closer to her home. Mother also indicated that she had previously received inpatient treatment for substance abuse on multiple occasions before this case was initiated. According to Hunter, mother was evicted from her apartment after each of her two arrests during this case. Hunter indicated that mother failed to overcome her alcohol addiction during Hunter's time working on the case. Substance abuse thus remained a barrier for mother when Hunter left the case.

With respect to the barrier of mental health, Hunter testified that mother did not appreciate the reality of the situation and minimized her issues. Mother was "extremely emotional and erratic on the phone," becoming suddenly loud, emotional, or hysterical in the middle of a conversation. Mother attended weekly mental health counseling and therapy through Community Mental Health (CMH) as part of her probation, and Hunter verified that she was participating in these services. She was being treated for bipolar disorder and anxiety. Mother had received inpatient mental health treatment before this case began. Hunter did not believe that mother's mental health improved to any significant degree because she continued to display inconsistent behavior, admitted to failing to regularly take her medication, and mixed her medication with alcohol.

Mother also completed a parenting class that included a mental health component. Hunter believed mother demonstrated some benefit from parenting class through her interactions with CL during parenting time. Mother and CL had a strong bond. According to Hunter, mother completed a psychological or psychiatric evaluation, and this evaluation did not recommend any other services beyond those that mother was already receiving. Mother was able to continue her mental health services after her May 2021 arrest. Mother's mental health issues remained a barrier when Hunter left the case.

At the end of Hunter's involvement with the case, parenting time had progressed to unsupervised overnight weekend visits. Parenting time seemed to be going well. However, Hunter explained that mother's family members would "parrot the same answers every time," stating that CL was afraid of leaving his mother. Hunter also indicated that both he and CL's therapists observed that CL tended to "not be perfectly honest with us and attempt to protect his mother."

Whitman testified that he became directly involved in the case in August 2021. At the time of Hunter's departure, mother was incarcerated in the Clinton County Jail. She was subsequently released to an inpatient facility offering an intense substance abuse treatment program.[3] Whitman stated that mother failed to complete this program and left the facility. Mother left the facility after two to three weeks of treatment. At some point, a warrant for mother's arrest was issued and she was incarcerated in Oakland County. Whitman testified that he was not aware of any further substance abuse services engaged in by mother. She was transferred back to the Clinton County Jail, and Whitman had been unsuccessful in his efforts to determine whether mother was participating in, or being offered, any services in the Clinton County Jail. At the time of the termination hearing, mother was still incarcerated.

Whitman stated that based on his review of mother's file and her CPS history, substance use had been an issue for mother since 2013. Mother's criminal history also included various substance related offenses that involved driving while intoxicated and public drunkenness. Since 2013, mother had received substance abuse treatment services from CPS and she had been treated in an inpatient rehabilitation program in 2013 and 2014, but she had a documented history of relapses with substance abuse. There was a history of domestic violence between mother and her father occurring in CL's presence, and mother had physically abused CL. There had been domestic violence between mother and a boyfriend. There were indications that these incidents of domestic violence involved substance use. CL had been removed from mother's care by CPS on two occasions before the instant case. Whitman testified that although mother had participated in services, she had not shown any benefit and substance abuse remained a barrier to reunification. More specifically, Whitman testified:

> *Q.* Is there a concern based on the history that though we may hear correct words and the statements that she will maintain sobriety, are there concerns about her ability to maintain sobriety going forward?

---

[3] It appears that this was a different inpatient treatment program than the one mother voluntarily entered immediately following her May 2021 arrest.

*A.* That is a concern. I do believe there is a concern that [mother] will be able to fully complete services and continue to maintain her sobriety.

*Q.* And the nature of this case with the Parent/Agency Treatment Plan, the Case Service Plan, was maintaining sobriety part of her Case Service Plan and Parent/Agency Treatment Plan?

*A.* Yes.

*Q.* And did she acknowledge that?

*A.* Yes.

*Q.* And was she successful in doing that?

*A.* No.

Whitman did not believe that mother had rectified any of the barriers from the initial treatment plan. He also explained that there was a history of mother's parents enabling her substance use by picking up CL when mother was using substances or having a domestic "situation." This pattern had caused trauma for CL. CL was in counseling and completing a trauma assessment. Whitman observed that CL was hesitant to speak to him when he visited CL to check on him, and CL appeared fearful of being "taken away." Whitman did not think that the barriers could be resolved within a reasonable time given CL's age.

Whitman was concerned about the nature of the bond between mother and CL. Mother had apparently reported that there was an incident where CL stabbed mother in the neck with a pen, mother called the police, and a CPS complaint was filed. There were indications that CL had expressed a belief that he was responsible for the removal from mother's care. However, mother's version of events differed from those in the CPS complaint, and Whitman was unsure whether there was any truth to mother's claim.

Whitman stated that he was concerned that substance abuse would continue to be an issue for mother and that she would not be able to provide long-term proper care and supervision for CL because mother's substance abuse issues had been ongoing since 2013 despite her participation in services. Whitman believed that CL needed permanency and that adoption was the most appropriate goal. CL was placed with his maternal aunt, and he had a strong bond with his aunt and cousins living in the home.

The trial court found that there was clear and convincing evidence to support termination under all three alleged statutory grounds—that the initial barriers continued to exist, that mother failed to provide proper care and custody, and that there was a reasonable likelihood the child would be harmed if returned to the parent—and the trial court also found by a preponderance of the evidence that termination was the minor child's best interests. The trial court's primary concerns were mother's substance abuse and untreated mental health issues. The court found, "We've had zero progress with substance abuse, zero progress with mental health issues. We've had substantial non-compliance with the case plans."

The trial court entered an order terminating mother's parental rights. The court found that reasonable efforts to preserve and reunify the family had been made but that those efforts were unsuccessful. This appeal followed.

## II. REASONABLE EFFORTS AND STATUTORY GROUNDS

Mother first argues on appeal that it was improper to terminate her parental rights because reasonable reunification efforts were not made and a statutory ground for termination was not established.

A trial court's finding "that reasonable efforts were made to preserve and reunify the family" is reviewed for clear error. *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005). This Court also reviews for clear error the trial court's determination that a statutory ground for termination was proven by clear and convincing evidence. *Id.* at 541. "A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made." *In re Smith*, 324 Mich App 28, 43; 919 NW2d 427 (2018) (quotation marks and citation omitted).

However, based on our review of the record, it does not appear that mother ever raised any objection in the trial court based on the reasonableness of the reunification efforts. Mother's appellate argument, which relies on a gross mischaracterization of the record, appears to be instead newly invented for appeal. Mother does not claim to have raised this issue below, nor does she cite any portion of the record purporting to demonstrate that the issue was raised below. "In general, issues that are raised, addressed, and decided by the trial court are preserved for appeal." *In re TK*, 306 Mich App 698, 703; 859 NW2d 208 (2014). Because mother did not raise this issue below, it is unpreserved for appeal. *Id.*; see also *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012) ("[R]espondents failed to object or indicate that the services provided to them were somehow inadequate, thereby failing to preserve this issue. The time for asserting the need for accommodation in services is when the court adopts a service plan . . . .") (quotation marks and citation omitted; ellipsis in original).

Unpreserved issues in termination proceedings are generally reviewed for plain error. *In re Beers*, 325 Mich App 653, 677; 926 NW2d 832 (2018).

> To avoid forfeiture under the plain-error rule, the proponent must establish that a clear or obvious error occurred and that the error affected substantial rights. "[A]n error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." [*Id.* (citations omitted; alteration in original).]

Turning to the specifics of mother's unpreserved appellate argument, mother argues that the DHHS was required to make reasonable efforts to preserve and unify the family, but the DHHS ignored this duty and did not provide services to address the barriers of substance abuse and mental health. She argues that Hunter failed to adequately monitor mother's substance abuse treatment and further, that mother could have benefitted from services such as counseling and parenting classes, which were never provided to mother. Mother states that she only participated in voluntary services on her own. Mother asserts, "Because there was no real case service plan, no services offered, no observed parenting time, and no reasonable reunification efforts to speak of, there is a

gap in the evidentiary record" making termination improper under *In re Mason*, 486 Mich 142, 158-160; 782 NW2d 747 (2010).

"In general, petitioner must make reasonable efforts to rectify conditions and reunify families." *In re TK*, 306 Mich App at 710-711; see also MCL 712A.18f; MCL 712A.19(6) and (7); MCL 712A.19b(5). Although the DHHS "has a responsibility to expend reasonable efforts to provide services to secure reunification," respondent-parents also have "a commensurate responsibility" to both participate in the offered services and demonstrate sufficient benefit from services. *In re Frey*, 297 Mich App at 248.

Here, mother's appellate argument is premised on a careless mischaracterization of the trial court record. She asserts that the DHHS did not provide any services. Contrary to mother's contentions, mother was engaged in random drug and alcohol testing, counseling, the Family Reunification Program, and parenting classes. Mother also asserts that there was no case service plan despite the existence of a case service plan in the record and Whitman's testimony at the termination hearing that mother had acknowledge that maintaining sobriety was a requirement of her case service plan. It is of no consequence to the issue raised on appeal that mother may have independently and voluntarily participated in some services and that some of mother's services may have been provided through her probation. *In re Fried*, 266 Mich App at 543 ("The fact that respondent sought treatment independently in no way compels the conclusion that petitioner's efforts toward reunification were not reasonable, and, more to the point, does not suggest that respondent would have fared better if the worker had offered those additional services to him."). The record reflects that the DHHS was aware that mother was receiving these services through her probation, relied on that fact, and received communications regarding mother's drug test results and participation in counseling.

Unlike the circumstances in *In re Mason*, the factual circumstances of this case do not evidence a situation where the DHHS completely "disregarded respondent's statutory right to be provided services" and totally failed to involve mother in the child protective proceedings. *In re Mason*, 486 Mich at 156-160. Thus, mother's reliance on *In re Mason* is misplaced.

Here, we are not presented with a factual record whereby DHHS failed to provide services but rather a factual record revealing that mother failed to benefit from the provided services. Despite her completion of services early in the case and having CL placed back in her care, mother's actions leading to her May 2021 arrest demonstrate that her behavior and inability to safely parent her child had not actually improved. Because the record evidence unequivocally shows that mother did not uphold her responsibility to benefit from services to address her substance abuse and mental health issues that negatively impacted her parenting ability, mother has not demonstrated that the trial court plainly erred by finding that reasonable reunification efforts had been made. *In re Beers*, 325 Mich App at 677. Furthermore, even had this issue been preserved, the record evidence discussed above also does not support a conclusion that the trial court's reasonable efforts finding was clearly erroneous. *In re Fried*, 266 Mich App at 542-543.

Mother also challenges the trial court's statutory grounds finding. "In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). Here, the trial court relied in part on MCL

712A.19b(3)(c)(*i*), which provides that parental rights may be terminated if "The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds . . . The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age."

Here, the record reflects that mother's adjudication was based on issues of substance abuse and mental health that negatively affected her ability to safely parent CL. The record also demonstrates that by the time of the termination hearing, which was more than 182 days after the initial disposition, mother had failed to rectify these concerns. In particular, she had failed to follow through and complete treatment programs for addressing her longstanding alcohol and substance abuse problem, and her continued abuse of alcohol led to additional criminal behavior that further disrupted the stability of CL's family situation when mother was arrested and CL was removed from the home yet again. Based on mother's history of substance abuse and failed attempts at treatment, as well as her apparent success in merely hiding the severity of her problem for significant periods of time as she did in this case, there is no reasonable likelihood that mother will be able to actually rectify this condition within a reasonable time given the child's age. Furthermore, there was evidence that her concurrent mixing of alcohol and her medications intended to treat her mental health issues diminished that effectiveness of her medication. It was not clearly erroneous for the trial court to conclude that mother's mental health issues continued to persist.

Accordingly, the trial court did not clearly err by finding that clear and convincing evidence supported terminating mother's parental rights under MCL 712A.19b(3)(c)(*i*). Only one statutory ground is necessary to support termination. *In re Frey*, 297 Mich App at 244.

## III. BEST INTERESTS

Mother additionally argues that the trial court clearly erred by finding that termination was in the child's best interests.

The trial court's best-interest determination is reviewed for clear error. *In re Fried*, 266 Mich App at 541.

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). At the best-interest stage, the focus is on the child and not the parent. *Id*. at 87. "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App at 41-42 (citations omitted). "A court may also consider whether it is likely that the child could be returned to her parents' home within the foreseeable future, if at all." *In re Kaczkowski*, 325 Mich App 69, 78; 924 NW2d 1 (2018) (quotation marks and citation omitted).

Here, for almost a decade and throughout virtually CL's entire life, mother had been struggling with substance abuse and mental health issues that negatively affected her ability to safely parent CL. Mother's well documented issues directly led to CPS involvement on multiple occasions. CL deserved a chance to have stability in his life without fear of repeatedly being removed from his home environment. Mother did not demonstrate that she was capable of overcoming her serious substance abuse and mental health issues to provide that stability for CL. At one point early in this case, CL had been fully returned to mother's custody and the court appeared to be close to releasing jurisdiction. Yet, it did not take long for mother's alcohol abuse problems, which she had apparently kept well-hidden up to that point in the case, to emerge again. She was arrested for drunk and disorderly behavior, and CL was once again removed from the home. Mother has demonstrated that she cannot provide the stability and safety that her child needs. The trial court did not clearly err by finding that termination of mother's parental rights was in CL's best interests. *In re Fried*, 266 Mich App at 541.

Affirmed.

/s/ Douglas B. Shapiro
/s/ Stephen L. Borrello
/s/ Christopher P. Yates