*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* TURNER/WANZER/WANZER-TURNER,
Minors.

UNPUBLISHED
April 16, 2026
2:00 PM

No. 376895
Kalamazoo Circuit Court
Family Division
LC No. 2022-000112-NA

Before: O'BRIEN, P.J., and FEENEY and WALLACE, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court order terminating her parental rights to the minor children, ST, EW, HW, and LW, under MCL 712A.19b(3)(c)(*i*) (conditions of adjudication continue to exist), (c)(*ii*) (failure to rectify other conditions), and (j) (reasonable likelihood that child will be harmed if returned to the parent).[1] We affirm.

## I. FACTS AND PROCEDURAL HISTORY

Respondent-mother has a history of involuntary hospitalizations for mental-health treatment related to her diagnosis of bipolar I disorder with manic and psychotic features. Since 2014, petitioner, the Department of Health and Human Services (DHHS), has had to remove minor children from respondent-mother's care numerous times. In March 2022, Kalamazoo Department of Public Safety Sergeant Kelly Pittelkow responded to a call and found respondent-mother in the lobby of an apartment complex engaging in bizarre behaviors and making "undecipherable statements." Because respondent-mother was at risk of harming herself, law enforcement officers took respondent-mother to Ascension Borgess Hospital for a psychiatric assessment. She was admitted for psychiatric services, and, on March 17, 2022, the probate division of the Kalamazoo Circuit Court ordered respondent-mother to undergo involuntary mental-health services at Borgess

---

[1] In the same order, the trial court terminated the parental rights of the respondent-father of ST, HW, and LW and the respondent-father of EW. Respondent-fathers have not appealed the order.

Hospital for up to 60 days and to continue outpatient psychiatric services and medication management at Integrated Services of Kalamazoo (ISK).

While respondent-mother was at Borgess Hospital, the children's maternal aunt drove from Tennessee to care for respondent-mother's eight minor children pursuant to what the aunt believed was a valid power of attorney. But as soon as respondent-mother was released from Borgess Hospital, she directed the aunt to return the children, and the aunt complied.

On April 9, 2022, respondent-mother was arrested and held in the Kalamazoo County Jail after breaking into her neighbor's apartment and trying to strangle her. The children's aunt again drove to Michigan from Tennessee to care for the children. DHHS petitioned to remove the children from respondent-mother's custody on April 15, 2022.[2] On the same day, an ISK therapist filed a notification of noncompliance in respondent-mother's probate case because she failed to attend her psychiatric appointment at ISK on March 28, 2022, refused to take her medication through ISK personnel at the county jail, was symptomatic, and needed immediate hospitalization. After respondent-mother was released from jail, she was again admitted for psychiatric treatment at Borgess Hospital and released on May 9, 2022.

ST, EW, HW, and LW were placed in licensed foster care until Tennessee could conduct an expedited investigation under the Interstate Compact on the Placement of Children (ICPC), MCL 3.711 *et seq*. The petition for the children's placement with their aunt was approved, and she cared for ST, EW, HW, LW in Tennessee throughout most of the proceedings in this case.

Following an adjudication trial, the trial court found by a preponderance of evidence that the children were at substantial risk of harm to their mental well-being and that respondent-mother did not provide for their proper custody or guardianship under MCL 712A.2(b)(1). After assuming jurisdiction over the minor children and respondent-mother, DHHS provided respondent-mother with a parent-agency agreement and case service plans that primarily focused on her need to address her mental health. Shortly thereafter, the probate court again ordered respondent-mother to comply with psychiatric care and medication.

Instead, respondent-mother moved to Minnesota. Over subsequent years, DHHS attempted to engage respondent-mother in mental-health services and communicate with her about her progress with those services. On behalf of DHHS, Minnesota conducted two ICPC investigations and twice denied respondent-mother's petition for the children's placement in her care in Minnesota. The primary reason for the denials was that respondent-mother's service plan through DHHS required her to engage in psychiatric services and medication management and she did not comply. During the case, respondent-mother visited ST, EW, HW, and LW once in person and otherwise exercised weekly parenting time over the phone or over videoconferencing.

---

[2] Four other minor children who are not parties to this appeal were also removed from respondent-mother's custody along with ST, EW, HW, and LW. The other minor children were placed with their legal fathers, and DHHS did not petition to terminate respondent-mother's parental rights to those children.

Because respondent-mother did not address her mental-health issues, and respondent-mother could not get approval through the ICPC for the children to be placed with her in Minnesota, the trial court ultimately ordered DHHS to file a petition to terminate respondent-mother's parental rights. Following a termination hearing, the trial court terminated respondent-mother's parental rights as described, and this appeal followed.

## II. PETITION FOR REMOVAL

Respondent-mother argues that the trial court erred by authorizing the petition to remove the children from respondent-mother's custody. We disagree.

### A. STANDARD OF REVIEW

We review errors during the adjudication phase of a child protective proceeding that are raised after the trial court has terminated parental rights under the plain-error rule. *In re Ferranti*, 504 Mich 1, 29; 934 NW2d 610 (2019). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To warrant reversal, the error must have "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings . . . ." *Id*. at 763-764 (quotation marks and citations omitted; alteration in original). The burden to show prejudice rests with the respondent. *In re Pederson*, 331 Mich App 445, 463; 951 NW2d 704 (2020).

### B. LEGAL PRINCIPLES

"To initiate a child protective proceeding," a petitioner "must file in the family division of the circuit court a petition containing facts that constitute an offense against the child under the juvenile code," MCL 712A.1 *et seq*. *In re Sanders*, 495 Mich 394, 405; 852 NW2d 524 (2014). See MCL 712A.13a(2); MCL 712A.2. If the petition is authorized, the trial court must further decide "whether the child should remain in the home, be returned home, or be placed in foster care pending trial." MCR 3.965(B)(12). Pretrial placement of a child removed from a parent's custody is addressed in MCL 712A.13a(9) and MCR 3.965(C)(2). "If the trial court orders placement of the child in foster care, it must make explicit findings that 'it is contrary to the welfare of the child to remain at home,' MCR 3.965(C)(3), and 'reasonable efforts to prevent the removal of the child have been made or that reasonable efforts to prevent removal are not required,' MCR 3.965(C)(4)." *In re Benavides*, 334 Mich App 162, 168; 964 NW2d 108 (2020). A trial court must make the reasonable efforts "determination at the earliest possible time," and "[i]n making the reasonable efforts determination under this subrule, the child's health and safety must be of paramount concern to the court." MCR 3.965(C)(4).

### C. DISCUSSION

Respondent-mother contends that the trial court plainly erred by authorizing the petition for removal of ST, EW, HW, and LW because she had a safety plan that the children's aunt would care for the children if respondent-mother suffered from a mental-health episode. Respondent-mother also takes the position that DHHS's efforts to prevent the need for removal were not reasonable because DHHS determined that the children should be placed in licensed foster care instead of finding a way to legally place the children with their aunt.

Although respondent-mother signed a power of attorney to give the children's aunt authority for the care of the minor children, it is undisputed that the original power of attorney expired because it was executed more than six months before the preliminary hearing. Respondent-mother executed another power of attorney while undergoing involuntary mental-health treatment at Borgess Hospital in March 2022, but after respondent-mother was released from the hospital on March 21, 2022, she revoked that power of attorney, before the petition for removal was filed in this case.

Thereafter, when respondent-mother had her next mental-health crisis on April 9, 2022, she had not placed the children with their aunt. By the time of the first preliminary hearing, a Tennessee court had denied the aunt's request to take custody of the children in Tennessee because it deemed the out-of-state power of attorney to be inadequate, which meant the children's aunt could not legally provide for the children's medical care and education in Tennessee.

The record reflects that the children's aunt previously cared for ST, EW, HW, and LW in Tennessee through a placement approved under the ICPC. However, the ICPC approval expired before respondent-mother's arrest in April 2022. For that reason, and in light of the aunt's history with the children and former agreements by respondent-mother that the aunt care for the minor children, DHHS submitted a request for expedited ICPC approval of the children's placement with their aunt in Tennessee.

As set forth in the ICPC, in Articles I, II, and III of MCL 3.711, the purpose of the ICPC is to allow a sending agency like DHHS to arrange for the care of a child in a receiving state— here, Tennessee. Under MCL 3.711, art III, DHHS could legally send ST, EW, HW, and LW to Tennessee as long as DHHS complied with the ICPC as well as Tennessee's requirements and laws governing the placement of children.

Respondent-mother complains that, when she had an arrangement with family to care for her children through the power of attorney, she did not leave the children without custody or guardianship under MCL 712A.2(b)(1)(C). However, for the reasons stated, respondent-mother did not place the children with their aunt before or at the time of her second mental-health crisis in April 2022. The Children's Protective Services (CPS) investigator stated that DHHS would allow the aunt to care for the children in Michigan because it appeared to be respondent-mother's wish, notwithstanding Tennessee's questions surrounding the validity of the power of attorney. The children were left without proper custody or guardianship at the time of removal because their aunt lived in Tennessee, she needed to return to Tennessee, and she could not legally care for the children in Tennessee. Further, when the petition was filed, the aunt was not the children's legal guardian, the power of attorney would have only allowed her to care for the children in Michigan, and the aunt told DHHS that she could not remain in Michigan.

Respondent-mother also argues that, before placing the children into foster care, it was incumbent on DHHS to comply with her wishes or to ask the children's aunt to remain in Michigan until DHHS could find a legal way to move the children to Tennessee. Respondent-mother maintains that placing the children into foster care within four days of their removal did not constitute "reasonable efforts" to eliminate the need for removal.

-4-

Again, DHHS would have allowed the aunt to care for the children in Michigan but could not force her to remain, respondent-mother's power of attorney was inadequate in Tennessee, and, to legally send the children to Tennessee, DHHS had to comply with the ICPC. Moreover, the record reflects an understanding by the trial court, petitioner, and respondent-mother's counsels[3] that, although they all deemed it preferable to place the children with their aunt in Tennessee, it was not possible to legally do so without a timely ICPC application and approval. Because of this understanding, there was no dispute at the first preliminary hearing that the children could not remain with their aunt or in respondent-mother's care while she was in jail and, thereafter, in a mental-health facility.

Indeed, following testimony regarding the power of attorney and the ICPC, both counsels for respondent-mother agreed with the CPS investigator's recommendation that ST, EW, HW, and LW should be placed in licensed foster care. A party may not take one position in the trial court and take the opposite position on appeal. *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011) ("Respondent may not assign as error on appeal something that she deemed proper in the lower court because allowing her to do so would permit [the] respondent to harbor error as an appellate parachute.").

Although respondent-mother argues that "it is entirely unclear why" DHHS did not set up a temporary guardianship for the aunt under MCL 700.5301a, neither of respondent-mother's counsels requested one and, instead, plainly agreed on the record that the children should be placed in foster care. Further, MCL 700.5301a does not apply to the facts of this case. A trial court may appoint a temporary guardian in Michigan if that person is already "a guardian appointed, qualified, and serving in good standing in another state . . . ." MCL 700.5301a(1). The children's aunt was not a duly appointed guardian of the children in another state and did not want to be appointed as their guardian in Michigan, so the statute is simply inapplicable. Further, to the extent that respondent-mother argues that DHHS should have asked the aunt to stay in Michigan in order to "buy more time for a solution," again, it is undisputed that the aunt lived and worked in Tennessee and needed to return to Tennessee. The "solution" was to seek an expedited ICPC investigation to arrange for the aunt's custody of the children in Tennessee, and the trial court entered orders to that effect. Under the circumstances, the record reflects that DHHS made reasonable efforts to avoid removal. See MCL 712A.13a(9)(d); MCR 3.965(C)(2)(d).

At the continued preliminary hearing, respondent-mother's counsel argued that, although the power of attorney would not be deemed valid in Tennessee, if respondent-mother had placed the children with their aunt before or at the time she went to jail, it would have been sufficient to overcome a finding that she left them without proper care or custody. For that reason, respondent-mother's counsel argued that the referee should not authorize the petition because respondent-mother should have been allowed to use the power of attorney to arrange for the children's care. As discussed, however, respondent-mother's counsel already agreed that the children should be placed in licensed foster care, and respondent-mother did not have the children in the aunt's care

---

[3] Respondent-mother was represented by an attorney as her legal counsel, as well as by an attorney as her guardian ad litem.

when the aunt was needed—when a mental-health crisis caused respondent-mother to break into a home and attack her neighbor.

For the reasons stated, respondent-mother has not shown that the order authorizing the filing of the petition was plainly erroneous because there was probable cause that respondent-mother could not care for the children while in jail and that the children were at risk of harm because there was no valid provision for the children's care or guardianship by their aunt in Tennessee under MCL 712A.2(b)(1). See *In re Ferranti*, 504 Mich at 29.

## III. ADJUDICATION

Respondent-mother argues that the trial court erred by assuming jurisdiction of ST, EW, HW, and LW following the adjudication trial. Again, we disagree.

### A. STANDARD OF REVIEW AND LEGAL PRINCIPLES

As discussed, "adjudication errors raised after the trial court has terminated parental rights are reviewed for plain error." *In re Ferranti*, 504 Mich at 29.

Our Supreme Court explained the adjudication phase of a child protective proceeding as follows:

> If the court authorizes the petition, the adjudication phase follows. The question at adjudication is whether the trial court can exercise jurisdiction over the child (and the respondents-parents) under MCL 712A.2(b) so that it can enter dispositional orders, including an order terminating parental rights. See [*In re*] *Sanders*, 495 Mich [394,] 405-406[;] 852 NW2d 524 [(2014)]. The court can exercise jurisdiction if a respondent-parent enters a plea of admission or no contest to allegations in the petition, see MCR 3.971, or if the Department proves the allegations at a trial, see MCR 3.972. "If a trial is held, the respondent is entitled to a jury, the rules of evidence generally apply, and the petitioner has the burden of proving by a preponderance of the evidence one or more of the statutory grounds for jurisdiction alleged in the petition." *Sanders*, 495 Mich at 405 (citations omitted). And "[w]hile the adjudicative phase is only the first step in child protective proceedings, it is of critical importance because the procedures used in adjudicative hearings protect the parents from the risk of erroneous deprivation of their parental rights." *Id.* at 405-406 (quotation marks, citation, and brackets omitted). The adjudication divests the parent of her constitutional right to parent her child and gives the state that authority instead. [*In re Ferranti*, 504 Mich at 15-16.]

### B. DISCUSSION

Following a bench trial, the trial court entered an order assuming jurisdiction over ST, EW, HW, LW, and respondent-mother because it found by a preponderance of evidence that the children were at substantial risk of harm to their mental well-being and that respondent-mother did not provide for proper custody or guardianship under MCL 712A.2(b)(1).

Respondent-mother maintains that the trial court plainly erred because evidence did not show that she mistreated the children or that the children witnessed her mental-health crises. According to respondent-mother, absent such evidence, the trial court could not find that there was a substantial risk of harm to their mental well-being. Respondent-mother's argument lacks merit.

Respondent-mother is correct that there was no allegation that she abused the children. However, it is undisputed that, at the time of adjudication, the children had been removed from her custody by DHHS on four other occasions because of her mental-health issues. Evidence also showed that respondent-mother failed to address her mental-health issues because she refused to take psychiatric medications or follow psychiatric plans of care and was involuntarily committed for psychiatric care on previous occasions.

Respondent-mother had a significant psychotic break in March 2022. At the time, respondent-mother left the children in an apartment with the door ajar. Their aunt was able to care for the children after she arrived from Tennessee but had to return the children to respondent-mother when respondent-mother was released from the psychiatric hold. For that reason, the children were again in respondent-mother's care on April 9, 2022, when she was arrested for breaking into her neighbor's home.

When respondent-mother's mental-health problems arose in March and April 2022, ST was 8 years old, EW was 6 years old, HW was 18 months old, and LW was 5 months old. Contrary to respondent-mother's argument, petitioner did not need to prove that respondent-mother physically or mentally mistreated the children or that she had a psychotic break in their presence. MCL 712A.2(b)(1) does not require actual harm but only a "substantial risk" of harm to the children's mental well-being. Respondent-mother's failure to address her psychiatric issues resulted in mental breaks during which respondent-mother left the children, committed crimes, and acted in what witnesses described as delusional ways. This evidence established that respondent-mother would likely have continuing psychiatric episodes in their presence or after leaving them. Repeated removals, abruptly and repeatedly leaving the children unattended, and respondent-mother's detachments from reality, escalated behavior, hallucinations, delusions, and disorganized thinking created a substantial risk of harm to the children's physical and mental well-being under MCL 712A.2(b)(1). Respondent-mother has not shown that the trial court's findings amounted to clear or obvious error. See *Carines*, 460 Mich at 763.

Respondent-mother also argues that the trial court's assumption of jurisdiction constituted plain error because there was no lack of proper custody or guardianship when she arranged for the children's care by their aunt. As stated in MCL 712A.2(b)(1)(C), the phrase "without proper custody or guardianship" does not apply when "a parent has placed the juvenile with another person who is legally responsible for the care and maintenance of the juvenile and who is able to and does provide the juvenile with proper care and maintenance." Respondent-mother is correct that, when a parent places a child in the custody of a relative, the child is generally not without proper custody or guardianship for purposes of MCL 712A.2(b)(1). See *In re Dixon (On Reconsideration)*, 347 Mich App 337, 356; 14 NW3d 497 (2023).

However, if a parent's preparations are not actually in place when a petition is filed or if the child is not actually placed with a contemplated relative when needed, the child is "without proper custody or guardianship" within the meaning of MCL 712A.2(b)(1). See *In re Baham*, 331

Mich App 737, 749-750; 954 NW2d 529 (2020). For the reasons discussed, respondent-mother did not place the children in their aunt's care or provide for her to take proper custody or guardianship of the children when respondent-mother had her mental break in April 2022. Respondent-mother has not shown that the trial court committed plain error by assuming jurisdiction over ST, EW, HW, and LW. See *In re Ferranti*, 504 Mich at 29.

## IV. REASONABLE EFFORTS

Respondent-mother contends that the trial court should not have considered any statutory grounds for termination because it first erred by finding that DHHS made reasonable efforts to reunify her with the children.

### A. STANDARD OF REVIEW

Respondent-mother failed to preserve this claim because she failed to object to the services when the service plan is offered, see *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012), or raise an objection or challenge "later during the proceedings," *In re Atchley*, 341 Mich App 332, 337; 990 NW2d 685 (2022). For those reasons, this issue not preserved, and we review it under the plain-error rule. See *In re MJC*, 349 Mich App 42, 47-48; 27 NW3d 122 (2023).

### B. DISCUSSION

In *In re MJC*, 349 Mich App at 49-50, this Court explained the efforts DHHS must make in child protective proceedings as follows:

> In general, when a child is removed from the parents' custody, the petitioner is required to make reasonable efforts to rectify the conditions that caused the child's removal . . . . An order terminating a parent's parental rights must state whether reasonable efforts have been made to . . . rectify the conditions that caused the child's removal from his or her home. Reasonable efforts to reunify the child and family must be made in all cases except if certain aggravating circumstances exist. [T]ermination is improper without a finding of reasonable efforts. As part of these reasonable efforts, the Department must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification. In addition to DHHS's duty to offer services to a respondent-parent, the respondent-parent has a duty to participate in and benefit from the services. [Quotation marks and citations omitted; alterations in original.]

Respondent-mother argues that DHHS failed to make reasonable efforts to reunify her with the children because it did not clearly state what she needed to do to address her mental health and, at some hearings, foster-care workers stated that respondent-mother was making progress toward reunification.

As discussed, respondent-mother has a documented history of severe psychiatric illness, psychiatric hospitalizations, court-ordered mental-health treatment, readmissions for noncompliance with mental-health medications and treatment plans, and termination of parental

rights cases. Given that history, to the extent that respondent-mother claims a lack of understanding that psychiatric care and medication compliance was required for reunification with ST, EW, HW, and LW, that claim is not credible.

Further, records admitted in the trial court showed that the requirements were plainly stated in respondent-mother's parent-agency agreement. Records also showed that DHHS regularly communicated with respondent-mother about her mental-health services and respondent-mother knew that the primary barrier to reunification was her failure to adequately address her serious psychiatric conditions. Respondent-mother also knew that she had to pass Minnesota's ICPC home study conducted on behalf of the Michigan DHHS in order for the children to be placed in her care in Minnesota. Those investigations plainly stated that respondent-mother was not addressing her mental-health issues as required by her agreement and treatment plan with Michigan, and respondent-mother acknowledged those findings.[4]

Nonetheless, throughout the proceedings, respondent-mother refused to engage in psychiatric care or take any psychiatric medications. She instead opted to engage in counseling or alternative "nontraditional" therapies, avoided disclosure or misinformed providers of her psychiatric diagnoses and extensive psychiatric history, and was not compliant with providing information about her mental-health services to DHHS.

The record is clear that respondent-mother had violent psychotic breaks while caring for eight children in Michigan. Her records also disclose that it was imperative that she take numerous antipsychotic medications, mostly under court order because of her noncompliance.

The record also reflects that respondent-mother had access to numerous mental-health services in Minnesota; she expressed no difficulty in finding psychiatrists; and, indeed, she stated that she scheduled her own appointments with at least three psychiatric providers. The record also reflects that respondent-mother either did not attend psychiatric appointments or she declined psychiatric services. The available records from her counselors show that she did not disclose her mental-health history, diagnoses, and medications. Although respondent-mother's psychiatric progress was not the focus of every hearing in the trial court, and some foster-care workers expressed optimism about respondent-mother's self-reported progress, respondent-mother's failure to actually address her mental-health issues did not occur because of any failure by DHHS to made reasonable efforts toward reunification.[5] Respondent-mother has not shown that the trial

---

[4] We disagree with respondent-mother's assertion that DHHS should have done more to help her overcome "administrative barriers" like her failure to get ICPC approval for the children's placement. The ICPC reports were discussed with respondent-mother, and she acknowledged that the primary reason for the rejections was her failure to adequately address her mental health.

[5] We also disagree that DHHS did not do enough to address issues of domestic violence. Respondent-mother repeatedly hid the fact that she remained in a relationship with the respondent-father of ST, EW, and LW. It defies logic that respondent-mother complains about lack of services to address an issue that she actively hid from DHHS. In any case, respondent-mother testified at the termination trial that she overcame issues related to that abusive relationship through the therapy that she received, so she has not shown that additional services were necessary.

court plainly erred by finding that DHHS made reasonable reunification efforts. See *In re MJC*, 349 Mich App at 47-48.

## V.  STATUTORY GROUNDS

Respondent-mother contends that the trial court erred by finding a statutory ground to terminate her parental rights.

### A.  STANDARD OF REVIEW

"We review for clear error the trial court's finding that there are statutory grounds for termination of a respondent's parental rights." *In re Atchley*, 341 Mich App at 343. "A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made." *In re Smith*, 324 Mich App 28, 43; 919 NW2d 427 (2018) (quotation marks and citation omitted). "When applying the clear-error standard in parental termination cases, 'regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it.' " *In re Mota*, 334 Mich App 300, 320; 964 NW2d 881 (2020), quoting *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989).

"A court may terminate a respondent's parental rights if one or more of the statutory grounds for termination listed in MCL 712A.19b(3) have been proven by clear and convincing evidence." *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012).

### B.  DISCUSSION

Respondent-mother asserts that clear and convincing evidence did not support termination under MCL 712A.19b(3)(c)(*i*) because she rectified the barrier of her mental health.

For the reasons discussed earlier, this assertion is factually incorrect. Respondent-mother did not address her severe mental-health problems because she did not engage in necessary psychiatric care repeatedly deemed necessary for her mental health. This case remained pending for more than 1,000 days and the children lived in Tennessee for most of that time. During the pendency of the case, respondent-mother agreed to engage in psychiatric care, but chose not to do so and actively avoided those services.[6]

At the time of the termination hearing, ST was nearly 12 years old and EW was 9 years old. Evidence showed that respondent-mother had her children removed five times since 2014, and the record reflects that the children also stayed with relatives without petitions for removal on numerous other occasions. For nearly all their lives, ST and EW had to bear the upheavals caused by respondent-mother's failure to address her mental-health needs. HW was nearly five years old

---

[6] Respondent-mother is correct that the trial court made a factual assertion about prior terminations that was incorrect. Four previous termination cases were filed, but they did not result in the termination of respondent-mother's parental rights. Notwithstanding this error, the crux of the trial court's point remained true because the children were removed so many times from respondent-mother's care.

-10-

and LW was three years old when the trial court considered termination under this statutory section. Because the case was pending for so long, both HW and LW spent more of their lives outside of respondent-mother's care than with her.

Considering the children's ages and given respondent-mother's lengthy history of psychiatric problems, the necessity of repeated orders for involuntary mental-health treatment, and her history of noncompliance with treatment plans, the trial court did not clearly err by ruling that there was no reasonable probability that respondent-mother would rectify her mental health within a reasonable time considering the children's ages. MCL 712A.19b(3)(c)(i); see *In re Atchley*, 341 Mich App at 343.[7]

## VI. BEST INTERESTS

Respondent-mother argues that the trial court erred by finding that termination of respondent-mother's parental rights was in the children's best interests. We disagree.

### A. STANDARD OF REVIEW AND LEGAL PRINCIPLES

We review for clear error a trial court's finding that termination of parental rights was in the child's best interests. *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009).

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts Minors*, 297 Mich App at 40. "Best interests are determined on the basis of the preponderance of the evidence." *In re LaFrance*, 306 Mich App 713, 733; 858 NW2d 143 (2014). "The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent[;] the parent's parenting ability[;] the child's need for permanency, stability, and finality[;] and the advantages of a foster home over the parent's home." *Olive/Metts*, 297 Mich App at 41-42 (citations omitted). Other factors a trial court may examine include "a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014). When making a best-interest determination in a child protective proceeding, a trial court must consider the children's placement with relatives, which usually weighs against termination. *In re Atchley*, 341 Mich App at 347. But if the trial court nonetheless finds that termination is in the children's best interests, the court may terminate a respondent's parental rights. *Id*.

---

[7] Only one statutory ground for termination must be established to terminate respondent-mother's parental rights, see *In re Trejo*, 462 Mich 341, 360; 612 NW2d 407 (2000). Although we need not address respondent-mother's arguments under other statutory sections, we find no merit to her claims of error under any other statutory grounds.

This Court explained guardianships in child protective proceedings as follows in *In re Lombard*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367714); slip op at 6:

> Under appropriate conditions, a trial court may forego [sic] termination and instead place a child in a guardianship. See MCL 712A.19a(8) and (9). A guardianship allows the child to keep a relationship with the parent when placement with the parent is not possible. A trial court is not required to establish a guardianship in lieu of termination if it is not in the child's best interests to do so. [Quotation marks and citation omitted.]

## B. DISCUSSION

Respondent-mother contends that the trial court should have given more weight to her bond with the ST, EW, HW, and LW and that their bond was apparent during parenting-time visits. Respondent-mother saw the children once in person after the children moved to Tennessee and respondent-mother moved to Minnesota in 2022. During that in-person visit, respondent-mother threatened the children's aunt and had to be escorted away by police. Respondent-mother's other parenting-time visits occurred over weekly video or phone calls.

Respondent-mother is correct that, in the beginning, the children were excited to see her during visits, and foster-care workers testified that there was a bond between respondent-mother and the children. But testimony established that, over time, the children's bond with respondent-mother weakened because of lack of in-person contact and because respondent-mother's unaddressed mental-health issues affected the parenting-time visits.

Respondent-mother did not ask for additional parenting time with the children and, at times, she even asked to stop having her weekly visits. The children's aunt asked DHHS to supervise the videoconference visits because respondent-mother was making inappropriate remarks to the children. Over time, respondent-mother and the children were not bonding much during visits and, when respondent-mother said inappropriate things to them, ST and EW became uncomfortable and even scared. ST asked not to participate in visits because respondent-mother's conduct made him so upset. By the time of the termination trial, the foster-care worker testified that the children simply did not have much to say to respondent-mother and many visits had to be ended early because of respondent-mother's inappropriate outbursts and use of profanity. There is no merit to respondent-mother's claim that the trial court gave inadequate weight to a bond that was strained to such a point.

Respondent-mother also argues that the trial court erred by failing to establish a guardianship with the aunt instead of terminating respondent-mother's parental rights. In this case, the children's aunt was not willing to act as the children's guardian; instead, she wished to adopt the children. As this Court explained in *In re Prepodnik*, 337 Mich App 238, 243-244; 975 NW2d 66 (2021):

> When a trial court finds that appointment of a juvenile guardian is in the best interests of the minor child, it is required to enter an order establishing a guardianship and appointing the guardian. MCR 3.979(B). The chosen guardian, then, must file an acceptance of that appointment, which "at a minimum" must state

-12-

"that the juvenile guardian accepts the appointment, submits to personal jurisdiction of the court, will not delegate the juvenile guardian's authority, and will perform required duties." MCR 3.979(B)(1).

Because their aunt did not want to accept the court's continuing jurisdiction or participate in court proceedings required by guardians, another guardian would have to have been appointed if the trial court decided that termination was not in the children's best interests. See *Prepodnik*, 337 Mich App at 244-245.

However, the best-interest factors weighed heavily in favor of termination, and the trial court did not err by declining to appoint a guardian for the children. As discussed, respondent-mother did not comply with her parent-agency agreement that she address her mental health. The children went through numerous removals because of respondent-mother's failure to do so for so many years. ST and EW both had behavioral problems in school because of the upheavals and instability they experienced in respondent-mother's care. All four children needed counseling because of trauma they experienced. Further, LW was diagnosed with autism and required early intervention services. Because respondent-mother could not address her own mental-health needs, and was overwhelmed caring for so many children, it is not reasonable to expect that she would be able to address LW's current and future needs.

As discussed, respondent-mother's visits with the children were not nurturing but, instead, became traumatic because ST and EW could recognize that respondent-mother had significant mental-health problems that she refused to address. For the same reason, the children's bond with respondent-mother weakened over time and they looked to their aunt for emotional support and stability. The record reflects that the children thrived in their aunt's home and that their behaviors improved dramatically. The children also engaged in numerous extracurricular activities, and had all their physical, medical, educational, and emotional needs met. The constancy of care offered by the aunt's home is in sharp contrast to the chaos in respondent-mother's home when so many mental-health emergencies would plainly draw focus away from the children's needs.

Although the children were in relative care with their aunt, under the circumstances, this was not a situation in which respondent-mother could maintain a close relationship with the children and their relative caregiver. Instead of moving close to the aunt and the children, respondent-mother moved much farther away. The children's aunt regularly came to respondent-mother's aid by caring for her children when respondent-mother had mental-health crises, but respondent-mother became angry with her over time and threatened her in front of the children.

Considering all the best-interest factors, and because the children's aunt was willing to

adopt the children,[8] the trial court did not clearly err by finding that termination was in the children's best interests.  See *In re Jones*, 286 Mich App at 129.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Kathleen A. Feeney
/s/ Randy J. Wallace

---

[8] *White*, 303 Mich App at 714.